SPRING MILLS, INC.,
Plaintiff-Appellant,

v.

ULTRACASHMERE HOUSE, LTD. and
Bart Schwartz, Defendants-Appellees.

No. 1156, Docket 82–7085.

United States Court of Appeals,
Second Circuit.

Argued May 24, 1982.

Decided Oct. 1, 1982.

Allan Zelnick, New York City (Weiss, Dawid, Fross, Zelnick & Lehrman, New York City, of counsel), for plaintiff-appellant.

On Submission (Hiram G. Shields and Leo Gitlin, New York City, of counsel), for defendants-appellees.

Before LUMBARD, OAKES and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

Spring Mills, Inc., plaintiff in this action, appeals from a judgment entered in the District Court for the Southern District of New York dismissing its complaint alleging trademark infringement, false designation of origin, and unfair competition. After a bench trial, Judge David N. Edelstein issued an opinion finding that Spring Mills was not entitled to injunctive relief, and that the defendants were entitled to judgment on the merits.

We reverse and remand the matter to the district court.

## I

Spring Mills, Inc. ("Spring Mills") is a South Carolina corporation which has been in the business of manufacturing and marketing fabrics and textiles for over 80 years. The company is the owner of the registered trademark "Ultrasuede",[1] which it applies to "non-woven suede-like fabrics", made by embedding polyester fibers in a polyurethane sheet. Ultrasuede enjoys a widespread reputation as a high-quality "luxury" fabric which is sold to fashionable "designer" garment houses for manufacture into items of apparel for the retail trade.[2] Spring Mills does not manufacture Ultrasuede but instead imports the material on a non-exclusive basis from Toray Industries,[3] the Japanese manufacturer of the material. Spring Mills has been marketing Ultrasuede since 1971, and between that time and September of 1981, the company had sold approximately $190 million worth of the ma-

terial at wholesale. The particular traits that apparently have made Ultrasuede so popular and saleable are, as the district court found, that it is more durable than suede and it is machine washable. Spring Mills has done relatively little by way of advertising Ultrasuede, relying instead on its customers, the garment manufacturers and retailers, who have promoted and advertised the product extensively.[4]

Defendant-appellee Ultracashmere House, Ltd. ("UHL") was formed in 1978 by individual defendant Bart Schwartz, who is now President of the company[5] UHL manufactures women's garments from Ultracashmere, which UHL described in its 1978 trademark registration application as "woven, cashmere-like fabrics ... containing synthetic fibers impregnated with synthetic resins." This description was false. Schwartz admitted during deposition that the Ultracashmere fabric, which UHL imports from Italy, is in fact simply spun rayon. He further testified that he knew of the falsehood when UHL applied to register the mark. The United States Patent and Trademark Office initially approved "Ultracashmere" for registration, but, after receiving opposition from Spring Mills, the Patent and Trademark Office suspended registration pending the outcome of this action.

On August 28, 1979, Spring Mills commenced the present suit, alleging four causes of action: (1) trademark infringement in violation of section 32(1) of the Lanham Trademark Act of 1946, 15 U.S.C.

---

1. Spring Mills also registered a stylized split logo version of its Ultrasuede mark, an example of which is provided in the section b. of this opinion discussing "The Degree of Similarity Between the Marks," *infra*.

2. Approximately 20% of Spring Mills' total sales of Ultrasuede is for resale to consumers as yard goods. An additional amount is sold to manufacturers for use in covering furniture.

3. Testimony at trial indicated that other United States customers can purchase the same fabric, which Toray Industries calls "Solidwear", from the manufacturer, and market it domestically under different trade names.

4. The district court found that Spring Mills spent only $500,000 in advertising and promoting Ultrasuede up to the time of trial. This

amounts to approximately ¼ of one percent of total sales of Ultrasuede during that time. The record shows that numerous articles have been written about the product at no expense to Spring Mills (although the company occasionally supplies quantities of the material for promotional demonstration purposes), and there have been books written about the fabric.

5. At deposition Schwartz refused to answer questions regarding ownership and control of UHL. However, since he did testify that he chose the mark "Ultracashmere", and made other major policy decisions with regard to UHL, we conclude that he was running the company.

§ 1114(1); (2) false designation of origin, false representation, or false advertising in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) unfair competition; and (4) common law trademark infringement. Jurisdiction was predicated under 15 U.S.C. §§ 1121, 1338.

In its prayer for relief, Spring Mills demanded *inter alia* that defendants be enjoined "from using the term ULTRACASHMERE or any term confusingly similar thereto, including any term containing the element "ULTRA" combined with the generic name of a fiber or fabric, alone or in combination with any other words, symbols and devices in respect of any aspect of its business, including but not limited to use as a corporate or trading name or as a trademark or in the advertising or selling of fabric or wearing apparel. . . ." Spring Mills also sought an order directing defendants to deliver up for destruction all labels, tags and promotional materials in their possession. In addition, Spring Mills asked for an accounting of profits.

On October 17, 1980, Judge Lowe, to whom the case was initially assigned, denied Spring Mills' motion for a preliminary injunction on the ground that Spring Mills had not demonstrated that it was likely to suffer irreparable injury. The case was subsequently transferred to Judge Edelstein, before whom a three-day bench trial was held commencing September 22, 1981. On January 20, 1982, Judge Edelstein filed an opinion in which defendants prevailed on all causes of action. Judgment was entered accordingly by the district court on January 26, 1982. Spring Mills noticed this appeal on February 22, 1982.

## II

█ Spring Mills maintains, *inter alia,* that the trial judge committed clear error when he determined that UHL had not infringed upon the Ultrasuede trademark in violation of section 32(1) of the Lanham Act. In addressing this issue we note, as the trial judge stated, that "the central inquiry in all cases of alleged trademark infringement and unfair competition is the likelihood of confusion, or the 'likelihood that an appreciable number of ordinarily

prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.' " (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). The trial judge also noted that in cases such as this, where the junior user of a mark's product is not in direct competition with that of the senior user, the question of likelihood of confusion " 'does not become easier of solution with the years,' " (quoting *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1130 (2d Cir. 1979)); *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

A number of different factors must be considered when assessing the likelihood that ordinarily prudent purchasers will confuse two different marks in cases where the products are not in direct competition. *See Polaroid Corp. v. Polarad Electronics Corp., supra,* 287 F.2d at 495, where Judge Friendly stated that,

[w]here the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account.

Judge Edelstein considered each of the *Polaroid* factors in reaching his decision, including bridging the gap, actual confusion, and quality of defendant's product. We need not address these particular factors given the strength of the showing with respect to the other factors, as discussed herein.

*a. Strength of the Mark*

█ A finding was made that "ULTRASUEDE is a strong mark and entitled to broad protection." The court determined that "Ultrasuede" is a "suggestive" mark, a

category exceeded in strength only by "arbitrary or fanciful" marks. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976). The district court also determined that the Ultrasuede mark had acquired further strength through widespread exposure to the public. In this regard, this Court has stated that

> "[t]he term 'strength' as applied to trademarks refers to the distinctiveness of the mark or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1131.

Appellees do not substantially dispute the district court's finding on this question and we agree that the record suggests that "Ultrasuede" is a strong mark entitled to broad protection.

### b. *The Degree of Similarity Between the Marks*

The district court found that the two marks in question were not substantially similar. In reviewing this finding, we note that "[t]o the degree that the determination of 'likelihood of confusion' rests upon a comparison of the marks themselves, the appellate court is in as good a position as the trial judge to decide the issue." *Miss Universe, Inc. v. Patricelli,* 408 F.2d 506, 509 (2d Cir. 1969); *McGregor-Doniger v. Drizzle, supra,* 599 F.2d at 1133.

We agree with the district judge that the ordinary consumer would perceive that "ULTRASUEDE connotes a suede-like fabric whereas ULTRACASHMERE connotes a cashmere-like fabric." This is, however, beside the point: appellant does not claim that the marks connote similar products beyond denoting both as "luxury" fabrics; rather, appellant maintains that UHL's mark is likely to confuse consumers as to the *source* of the Ultracashmere product.

*See American Home Products v. Johnson Chemical Co.,* 589 F.2d 103, 107 (2d Cir. 1978).

In this regard, an inquiry into the degree of similarity between two marks does not end with a comparison of the marks themselves. As this Court has stated, "the setting in which a designation is used affects its appearance and colors the impression conveyed by it." *McGregor-Doniger, supra,* 599 F.2d at 1133 (quoting the Restatement of Torts § 729, Comment b at 593). Since "it is the effect upon prospective purchasers that is important," *Id.,* the "impression" conveyed by the setting in which the mark is used is often of critical importance.

Here, both the Ultrasuede mark and the Ultracashmere mark are most commonly presented to prospective purchasers on cardboard hang tags which are attached to garments made from the two fabrics. Spring Mills, in order to help promote the sale of Ultrasuede, has in the past provided three different hang tags displaying the Ultrasuede mark to be used by garment manufacturers and yard good retailers.[6] The most widely used of these tags (see figs. 1 and 3, reproduced below), some three million of which had been distributed by the time of trial, shows a stylized version of the Ultrasuede mark on the front in addition to a small legend which proclaims that it is a Skinner Couture Fabric.[7] The reverse side of the tag has a brief promotional blurb followed by "care instructions."

When UHL began marketing garments made from Ultracashmere, it also attached hang tags (see figs. 2 and 4, reproduced below) which were strikingly similar to the Ultrasuede tags. Although the small legend on the front of the Ultracashmere tag states "Ultracashmere House, Ltd." instead of "a Skinner Couture Fabric," the logos for the two products are similar in composition and display. The promotional language on the Ultracashmere tag (fig. 4) as well as the

---

**6.** The most widely used of these tags is described in detail in the text. Spring Mills also supplies a tag for use by manufacturers who wish to make a garment containing both Ultrasuede and another fabric which is non-washable: this tag specifies that the garment can only be dry-cleaned. For yard goods, Spring Mills supplies still another tag which, in addition to care instructions, specifies the country of origin of the fabric.

**7.** Skinner is a trade mark owned by Spring Mills which the company uses to denote certain specialty fabrics.

care instructions are virtually identical to those on the Ultrasuede tag (fig. 3)—despite the facts that Ultracashmere contains *no* "non-fibrous polyurethane," and that it *will* shrink if washed by machine.

Fig. 1

FABRIC

Fig. 2

a *Skinner* couture fabric

ULTRACASHMERE HOUSE, LTD

On August 28, 1979, when this action was commenced, the Ultrasuede tags. (figs. 1 and 3) were yellow with black printing and the Ultracashmere tags (figs. 2 and 4) were white with black printing. In 1980, Spring Mills changed the background color of the Ultrasuede tags from yellow to silver (with maroon printing), and deleted the phrase "more like suede than suede itself!" Shortly thereafter, in an apparent effort to track the Ultrasuede tag changes, UHL also changed the background color of its tags from white to silver (with black printing). UHL also deleted the phrase "more like cashmere than cashmere itself!"

Spring Mills also changed the shape of the Ultrasuede tag: the present tag is somewhat longer in relation to its width and the ends are rounded rather than squared. Also, the "Ultrasuede" logo is now a single line on the front of the new tags rather than the double line split logo used formerly. The new Ultracashmere tag does not reflect these changes.

Moreover, UHL modified the care instructions on its tag to state that Ultracashmere should only be dry-cleaned. In addition, the Ultracashmere fiber content description was changed from "Multiple Fiber X–14 spun non-fibrous Polyurethane," which was both meaningless

Fig. 3

## ultra suede
FABRIC

A non-leather product of 60%
Polyester 40% non-fibrous
Polyurethane

more like suede than suede itself!
feels like suede. . .right down to the
nap!
it's washable — by hand or machine!
won't shrink, pill, fray, crock or
wrinkle!
it's colorfast and won't water-spot or
stiffen!

### CARE INSTRUCTIONS
- MACHINE WASHABLE/DELICATE
 CYCLE/TUMBLE DRYABLE/LOW
 SETTING. USE MILD DETERGENT
 WITHOUT BLUING AGENTS. (i.e.
 IVORY SNOW; WOOLITE)
- DO NOT USE BLEACH
- WASH ALONE TO AVOID STAIN-
 ING FROM OTHER FABRICS
- HAND WASHABLE/HANG TO DRY
 DO NOT WRING OR TWIST
- DRY CLEANABLE BY CONVEN-
 TIONAL METHODS
- PRESS GARMENT ON REVERSE
 SIDE USING PRESSCLOTH AND
 LOW SYNTHETIC SETTING
- LIGHT BRUSHING WILL RE-
 STORE NAP

**Springs** Retail & Specialty Fabrics Division
Springs Mills Inc 1430 Broadway New York N Y 10018

Fig. 4

## ULTRA CASHMERE®

Multiple Fibre X-14
spun non-fibrous Polyurethane

more like cashmere than cashmere
itself! feels like cashmere . . . right
down to the nap!
it's washable — by hand or machine!
won't shrink, fray, crock or wrinkle!
it's colorfast and won't water-spot
or stiffen.

### CARE INSTRUCTIONS
- MACHINE WASHABLE / GENTLE
 DELICATE / TUMBLE DRYABLE
 10 MINUTES.
 USE MILD DETERGENT (i.e. IVORY
 SNOW, WOOLITE).
- WASH ALONE TO AVOID STAIN-
 ING FROM OTHER FABRICS.
- HAND WASHABLE / HANG TO DRY,
 DO NOT WRING OR TWIST.
- DRY CLEANABLE BY CONVEN-
 TIONAL METHODS.
- PRESS GARMENT ON REVERSE
 SIDE, ON FACE SIDE USING PRESS
 CLOTH.
- LIGHT BRUSHING WILL RESTORE
 NAP.

ULTRACASHMERE HOUSE, LTD.
NEW YORK, N.Y.

---

and false,[8] to "superior spun raion [sic]" which now accurately describes Ultracashmere's true fiber content of 100% rayon. According to the record, the most recent modified version of the Ultracashmere tag had not been distributed at the time of trial.[9]

In viewing the marks in light of their hang tag settings, we think the trial judge erred when he determined that the two

**8.** As noted in the body of the opinion, Ultracashmere contains no polyurethane. In addition, the record shows that there is no recognized fabric description "Multiple Fibre X-14."

**9.** The record is vague as to which of the modifications of the Ultracashmere tag were actually in distribution at the time of trial. It is apparent that up until then UHL was still distributing

a version which falsely designated the fiber content of its fabric, and which still contained the blurb "More like cashmere than cashmere itself!" Whether the silver tag had been distributed by the time of trial is not clear. However, it does appear that by the time of trial UHL had distributed a tag which stated that Ultracashmere was to be dry-cleaned only.

marks differ significantly. He placed undue emphasis on the small legends on the hang tags which identified the manufacturers of the two fabrics, finding them to be "[t]he most important distinguishing feature present in all of the tags, new and old." We believe the reliance by the trial judge on *B & L Sales Associates v. H. Daroff & Sons, Inc.,* 421 F.2d 352 (2d Cir.), *cert. denied,* 398 U.S. 952, 90 S.Ct. 1873, 26 L.Ed.2d 292 (1970), was misplaced. In *B & L Sales,* the plaintiff had registered the trademark "Come on Strong" for use on a line of work clothes and on certain household products. Defendant used the phrase as an advertising slogan to promote a well-known brand of men's suits. This Court stated that "no intent [on defendant's part] to use the phrase in a trademark sense can be inferred from [the] promotional materials." *Id.* at 353. The advertisements containing the phrase clearly stated the brand of suits being promoted as well as the name of the manufacturer. In direct contrast to the facts herein, the *B & L Sales* Court noted that it was apparent "that defendant [had] never directly applied the phrase to its products by tag, label or otherwise." *Id.* The Court affirmed the district court's finding that defendant had never used "Come on Strong" as a trademark "or as anything other than a [common] slang term describing a presumably desirable effect." *Id.* at 354. Under the circumstances, the Court held that no likelihood of confusion of the source of defendant's goods had been demonstrated. Here, on the contrary, Judge Edelstein stated that "[a] consumer shopping for an expensive garment or fabric may come across both ULTRASUEDE and ULTRACASHMERE [and] it may be assumed that consumers are aware that many fabric manufacturers have several lines of fabric. Thus, an ordinarily prudent purchaser may think that the same company manufactures both ULTRASUEDE and ULTRACASHMERE."

The Ultracashmere mark appears both on garment labels and on hang tags, and, as discussed above, as of the time of the commencement of this action, the latter presented care instructions and promotional language which were virtually *in haec verba* copies of that on the Ultrasuede tags. Even after changes were made on both parties' tags (and we note again that the record does not make clear which modifications were on the Ultracashmere tag actually in distribution at the time of trial, see note 9, *supra* ), we believe that the marks, taken in their described settings, remain substantially similar. In any event, we do not find the modifications on the two tags to be significant. Surely, it cannot be that one party can deliberately infringe upon another's trade dress and then escape liability for its actions merely by changing its trade dress after the aggrieved party institutes a law suit. We are concerned here primarily with the similarity of the marks as presented on the two hang tags that were in distribution when this action was commenced.

It does seem likely that if the two hang tags were to be viewed side-by-side (either the original or modified versions), the ordinary consumer of expensive "luxury" garments would realize that the sources of the fabrics were different. However, "[t]he test is not whether the consumer will know the difference if [s]he sees the competing products on the same shelf. It is whether [s]he will know the difference if [defendant's product] is *singly* presented and [s]he has heard of [plaintiff's product]." *American Home Products v. Johnson Chemical Co., supra,* 589 F.2d at 107 (emphasis in original). We find that the ordinary consumer of luxury garments made from synthetic fabrics who is familiar with the Ultrasuede brand, if presented with a garment bearing an Ultracashmere hang tag, would be likely to believe that the two products come from the same source. On this basis, we find the marks, as they are most commonly presented to potential consumers (*i.e.,* on the hang tags), to be substantially similar.

### c. The Proximity of the Products

It is clear, as the trial judge found, that the two fabrics are different: "ULTRASUEDE is a molded suede-like fabric where-

as ULTRACASHMERE is a woven cashmere-like fabric." Slip op. at 19. A person shopping for a garment with the characteristics of suede would not accidentally buy an Ultracashmere garment. However, again our concern with product proximity relates to "the likelihood that customers may be confused as to the *source* of the products, rather than as to the products themselves, and the concern is not direct diversion of purchasers but indirect harm through loss of good will or tarnishment of reputation." *McGregor-Doniger, supra,* 599 F.2d at 1134–35 (emphasis in original). In this regard, we agree with Judge Edelstein that the competitive distance between Ultrasuede and Ultracashmere is moderate. This is so since, as he noted, the ordinary consumer may well be aware that the fabric manufacturers have several lines of fabric and such a purchaser could easily assume that, while the fabrics themselves are different, they belong to the same genre of products and might well have the same source.

### d. *Defendants' Good Faith in Adopting its Mark*

 The court below stated that "[i]t is clear from the record that defendants chose the ULTRACASHMERE trademark and designed the ULTRACASHMERE hang tag with the ULTRASUEDE trademark and hang tag in mind." Nonetheless, he found "that defendants did not act in bad faith in selecting the trademark ULTRACASHMERE." We find this determination to be clearly erroneous.

As authority for his finding the district judge relied upon *Mushroom Makers, Inc. v. R. G. Barry Corp.,* 441 F.Supp. 1220 (S.D.N.Y.1977), *aff'd,* 580 F.2d 44 (2d Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). There, the court stated that "[t]he fact that one believes he has a right to adopt a mark already in use because in his view no conflict exists since the products are separate and distinct cannot, by itself, stamp his conduct in bad

faith . . . ." *Id.* at 1230. The crucial difference between *Mushroom Makers* and the present case is that there it was determined that the junior user had not sought to obtain a "free ride" at the senior user's expense. The court found that the junior user was unaware of the senior user's mark when it selected its own; it was only later that it became aware that another was using a similar mark. The court further determined that the senior user had only recently begun to use its mark in commerce and that its volume of sales was low. In essence, the senior user in *Mushroom Makers* had not established the sort of extensive reputation and distinctive consumer identification for its mark that would attract a trademark infringer interested in a free ride.

The evidence in the present case reveals a quite different situation: it is virtually certain that defendants adopted their mark and trade dress for no other purpose than to obtain a free ride on the good reputation of their successful competitor. It is undisputed that Ultrasuede was already the well-established name of a highly reputable product when defendants adopted the Ultracashmere mark. Moreover, defendant Schwartz testified in deposition that he was aware of both the Ultrasuede mark *and hang tags* when the Ultracashmere mark *and tags* were adopted. As noted in footnote 5, *supra,* Schwartz personally selected the mark "Ultracashmere", and he further testified that he participated in designing the Ultracashmere hang tag.

No motive other than a desire for a free ride would appear to explain the slavish copying of the Ultrasuede hang tag by defendants. This copying of trade dress extended not merely to falsely claiming that Ultracashmere, like Ultrasuede, would not shrink when washed by machine, but went so far as to include a claim that Ultracashmere (like Ultrasuede) contained non-fibrous polyurethane, when in fact it contained no polyurethane in any form.[10] Schwartz

10. Plaintiff suggests that the false description of Ultracashmere promulgated by defendants

may have violated provisions of the Textile Fiber Products Identification Act, 15 U.S.C.

testified that he decided to claim that Ultracashmere contained polyurethane because this ingredient was "fashionable."[11] One reason it was fashionable was very likely that it was an important ingredient in the already highly successful Ultrasuede product, upon the reputation of which defendants sought to profit.

A first user, especially where he possesses a strong mark, has a right not to have a second user intentionally cause a likelihood of confusion between two marks for the purpose of exploiting the reputation of the first user's mark, since this deprives the first user of control over its own reputation and goodwill. *McGregor-Doniger, supra,* 599 F.2d at 1134–35. Moreover, we cannot ignore the fact that UHL knowingly made false representations both in its application for trademark registration and to the public in the Ultracashmere hang tags. Also, the individual defendant Schwartz, who is the president of UHL, has had a less than desirable history in the fabric trade which preceded the commencement of events in this lawsuit.[12] In light of all of this, it is not unreasonable for plaintiff to fear that defendant Schwartz, through UHL, may act in the future so as to cause injury to plaintiff's reputation.

We find that defendants' adoption of the Ultracashmere mark and the copying of the hang tag was not only done in bad faith, but that these acts constituted a blatant example of trade piracy. As Judge Learned Hand wrote,

"Why it should have chosen a mark that had long been employed by [plaintiff] and had become known to the trade instead of adopting some other means to identify [their] goods is hard to see unless there was a deliberate purpose to obtain some advantage from the trade which [plaintiff] had built up." Indeed, it is generally true that, as soon as we see that a second comer in a market has, for no reason that he can assign, plagiarized the "make-up" of an earlier comer, we need no more; for he at any rate thinks that any differentia he adds will not, or at least may not, prevent the diversion and we are content to accept his forecast that he is "likely" to succeed. Then we feel bound to compel him to exercise his ingenuity in quarters further afield.

*American Chicle Co. v. Topps Chewing Gum, Inc.,* 208 F.2d 560, 562–63 (2d Cir. 1953) (quoting *Miles Shoes, Inc. v. R.H. Macy & Co.,* 199 F.2d 602, 603 (2d Cir. 1952), *cert. denied,* 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953)).

Two years later, Judge Frank observed that,

[W]here the copying is unlawful, if only there is a likelihood of confusion, then the intent of the copier becomes decidedly relevant: It gives rise to a powerful inference that confusion is likely, and puts on the alleged infringer the burden of

§ 70(a) *et seq.,* as well as various Federal Trade Commission regulations. In a clearly apparent effort to nullify this point, defendants introduced evidence at trial that the Ultrasuede fabric is similarly mislabeled. The Ultrasuede tag states that the material is "60% polyester 40% non-fibrous polyurethane." An expert witness called by defendants testified that the *fiber* content of Ultrasuede is 100% polyester. The polyurethane acts as a coating or binder. The merits of neither of these allegations are before us and we offer no opinion regarding them.

11. We note in passing that the transcript of Schwartz's deposition testimony indicates that he was both a recalcitrant and truculent witness. He steadily refused to answer the most innocuous questions, instead accusing plaintiff of desiring to obtain his trade secrets. When confronted with the intentional mislabeling of Ultracashmere's fiber content, Schwartz reacted by accusing Spring Mills of having mislabeled Ultrasuede's fiber content even more misleadingly. See note 10, *supra.*

12. In *Bart Schwartz International Textiles, Ltd. v. Federal Trade Commission,* 289 F.2d 665 (C.C.P.A.1961), the Court of Customs and Patent Appeals found that Schwartz had fraudulently obtained the registration of the trademark "Fiocco" to describe a rayon fabric in contravention of "what [he] knew to be the rights of others to use the word.... *Id.* at 669. Schwartz swore in a written declaration in his application to register "Fiocco" that no others had a right to use the word "despite factual information to the contrary which [the court found] from the evidence he possessed at that time." *Id.* at 671.

going forward with proof that it is not. Here the plaintiff's intent is unmistakable; accordingly, plaintiff had the burden of going forward with proof showing an absence of such likelihood; and that burden plaintiff did not discharge. *Mastercrafters C. & R. Co. v. Vacheron & Constantin-Le Coultre Watches,* 221 F.2d 464, 467 (2d Cir.), *cert. denied,* 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955). Given our findings herein, it is our conclusion that the defendants herein have similarly failed to discharge their burden of showing no likelihood of confusion between the two marks at issue.

We are satisfied that defendants acted in bad faith when they copied plaintiff's mark and trade dress, and we are "left with the definite and firm conviction" that the court below was mistaken when it found otherwise. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).

*Summary*

We find that the district court erred in its determination that the marks Ultrasuede and Ultracashmere were not substantially similar when taken in the context of the setting in which they are displayed. Further, and more importantly, the determination that defendants did not act in bad faith when adopting their mark and trade dress was clearly erroneous. These conclusions in turn led to the clearly erroneous finding that there was no likelihood of confusion.

Ultimately, by intentionally imitating the plaintiff's Ultrasuede mark and trade dress, defendants implicitly stated that they believed that they could create a likelihood of confusion among consumers as to the source of their product and that they could profit thereby. Accordingly, as did the Court in *American Chicle, supra,* we should take them at their word. We therefore hold that, in the context and under the circumstances above described, defendants are liable under section 32(1) of the Lanham Act,

but we emphasize that we are not holding that Spring Mills has any exclusive trademark rights to the use of the prefix "Ultra" when used in conjunction with fabric names other than "suede".

In light of our findings, we reserve for the district court the task of devising an appropriate injunction. It is our suggestion that the district court fashion a remedy in such a way that the defendants, so long as they use the trademark "Ultracashmere" (or any substantially similar mark) on their products, in trade dress, in advertisements or in promotional literature, be required to include in these items a statement, in appropriate form, to the effect that "Ultracashmere" is not associated in any way with either Ultrasuede, Spring Mills, Inc. or Skinner. *See Mushroom Makers, Inc. v. R.G. Barry Corp., supra,* 441 F.Supp. at 1234; *National Football League v. Governor of the State of Delaware,* 435 F.Supp. 1372, 1381 (D.Del.1977).

In addition, inasmuch as the district court's dismissal of plaintiff's other claims (*i.e.,* false designation of origin in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[13] and unfair competition was based on the determination that plaintiff had failed to show a likelihood of confusion, and since we have determined that there is a likelihood of confusion, we reverse the district court's dismissal on the merits of those claims and remand them for such further action as is consistent with this opinion.

Costs on appeal to appellants.

---

13. The district court found that the plaintiff had failed to meet the burden of proof in a section 1125(a) claim in failing to offer evidence of competitive injury. However, competitive injury is not required for recovery under section 1125(a). *McGregor-Doniger v. Drizzle, supra,* 599 F.2d at 1134–35.