**ARIS–ISOTONER GLOVES, INC., Plaintiff,**

v.

**FOWNES BROTHERS & CO., INC., Defendant.**

**No. 81 Civ. 3573 (RWS).**

United States District Court, S.D. New York.

June 30, 1983.

Townley & Updike, New York City, for plaintiff; James B. Swire, Robert L. Raskopf, Colleen P. Cassidy, New York City, of counsel.

Liddy, Sullivan, Galway & Vaccaro, New York City, for defendant; Andrew V. Galway, Susan L. Cohen, New York City, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff Aris-Isotoner Gloves, Inc. ("Aris") commenced this trademark in-

fringement and unfair competition action against defendant Fownes Brothers & Co., Inc. ("Fownes") seeking to enjoin Fownes from the use of a design on its gloves which Aris alleges infringed its double V trademark. On the basis of the following findings of fact and conclusions of law, final judgment will be entered granting certain, but not all, of the injunctive relief sought by Aris.

**Prior Proceedings**

This action was commenced by the filing of a complaint on June 9, 1981. Discovery was had, and a bench trial conducted from February 7 to February 15, 1983. Final submissions were filed on or about March 25, 1983.

## FINDINGS OF FACT

Aris is a Maryland corporation with its principal place of business at 417 Fifth Avenue, New York, New York. Aris is a wholly-owned subsidiary of Consolidated Foods Corporation and is engaged in the manufacture, distribution, advertising and sale of gloves nationwide. Aris or its predecessors have been in the glove business since the early 1900s.

Aris is the proprietor of Registration No. 1,192,171, issued March 16, 1982 in the United States Patent and Trademark Office ("PTO") for a double V, or double chevron, trademark on the back of gloves.

Fownes, a New York corporation with its principal place of business at 411 Fifth Avenue, New York, New York, is also in the business of manufacturing and selling gloves and has been so engaged since 1777.

In the fall of 1970, Aris offered for sale a new style of glove, style no. 23092, which is called the "Isotoner" driving glove, made of a stretch spandex fabric with perforated leather strips forming a distinctive double V or double chevron device (now its registered trademark) on the back of the gloves. On the palm side, Aris placed perforated leather stripping on the fingers and around the base of the thumb, and a strip running from the wrist to the thumb. Aris has used the double V device continuously on its Isotoner line, and the overall appearance of its original style no. 23092 has not changed since 1970.

Aris gloves bearing the double V trademark have been extensively promoted and advertised on national television, in newspapers, in magazines, in retail store catalogues, and through the use of bill enclosures and point-of-sale promotional materials. From 1970 to 1982 plaintiff has expended in excess of $18 million in promoting its gloves bearing the double chevrons in advertising which stressed the "iso-massage action" of the gloves. This advertising and promotion has been focused on the appearance of its gloves, particularly the double V chevrons. The gloves are marketed in individual boxes with a cellophane "window" through which the double chevrons can be seen by consumers.

Aris gloves bearing the double V mark are by far the leading selling gloves in the industry. From 1970–1982, Aris has sold more than $100 million at wholesale in the double V Isotoner gloves alone. In 1982 Aris sold over $18 million worth of gloves with double chevrons. Aris also developed a hangtag to be affixed to its gloves which clearly described the double V symbol as its trademark.

In 1975, Aris issued cease and desist letters against manufacturers whose gloves were considered by Aris to imitate its double chevron and has succeeded in stopping several infringers of its mark. In 1977, Aris sued the Van Raalte Glove Company and its parent, Cluett, Peabody & Co., for their infringement of its common law trademark and trade dress involving a vinyl glove. The case was settled on the eve of trial by a consent judgment against Van Raalte, in which Aris' trademark and trade dress rights were recognized. Aris then applied to register its double V trademark with the United States Patent and Trademark Office, which found that Aris had acquired secondary meaning in its trademark, and issued Aris Registration No. 1,192,171. During the course of discovery in the Van Raalte case, Abraham Sherr, the president of Fownes, testified for Van

Raalte at a deposition. By that time, if not earlier, Fownes was on notice of Aris' claim of trademark rights.

In 1978, Aris introduced an acrylic-lined version of the double chevron gloves, called "Warm-Ups." The lined version is made of spandex, bears the double V trademark and the distinctive palm stripping. Aris also began using the double V with its name as its corporate logo, including in its television commercials. In 1982, Aris also introduced cashmere lined Isotoner gloves to which it affixed small stylized gold metal double chevrons in addition to its classic perforated leather chevrons, to indicate top of the line gloves.

In 1976, Fownes introduced a glove named "Vibrance" made of a stretch spandex fabric with perforated leather stripping on the fingers and palms and a diamond shape design made of perforated leather strips applied to the backs.

The "Vibrance" glove was similar in material to the Aris Isotoner gloves. Fownes packaged the gloves in a box with a window displaying its design and advertised its Vibrance gloves as "the glove with the built-in tingle," providing a "massage-like action". The Vibrance glove did not and does not bear a double chevron device on the back.

In 1977 Fownes offered for sale a suede glove, style No. 5028 which glove bore a double chevron on the back similar to the Aris double chevron. Aris wrote a protest letter to Fownes to which Fownes did not reply.

In the fall of 1980, Fownes offered for sale glove style no. 1583, made of spandex and lined with acrylic, and bearing a double chevron design made of perforated leather strips on the backs of the gloves. These gloves also contained a strip running from the thumb to the wrist, also found on the Aris gloves.

Fownes' style no. 1583 glove was named "Vibrance Plus" and sold in an individual box with a window displaying the glove in a manner similar to that adopted by Aris for its gloves bearing the double chevron. It is the failure of Fownes to cease selling this glove which resulted in this action.

Fownes has petitioned to cancel Aris's trademark registration in the United States Patent and Trademark Office and, in so doing, affirmatively alleged that its mark and Aris's are confusingly similar.

The use of a chevron on a glove can be traced in time from the days of Tutankhamen to today. The chevron was used on armor in the middle ages, on ladies gloves in the 18th century, and on ski gloves in the 20th century. Because of the nature of the V design, it is difficult to differentiate between a single and double V design since the edges of a single V thereby constitute a double V. At issue here is the difference between the Aris design and the Vibrance Plus design.

In 1948 Fownes sold a glove with a chevron design, closer to the Isotoner than the Vibrance Plus design. Similar designs were used in 1952, 1956, 1958 and 1961 before the adaption of style 5028 in 1977 and style 1583 in 1980. Fownes designed its gloves in house and used an independent designer for this purpose. It was not established that the Aris glove or its advertising was used in the design of 5028 or 1583, but given the scope of the advertising and the market leadership established by Aris, it is inconceivable that anyone knowledgeable in the trade was ignorant of the Isotoner one-size-fits-all. The Van Raalte litigation brought home specifically to Fownes' top management in 1978 the legal issues surrounding the Aris design, particularly in connection with the deposition of Abraham Sherr, the president of Fownes which was taken on June 7, 1978.

The design of the Vibrance Plus glove has features identical to Isotoner, its spandex material, the palm and finger treatment, the manner of its packaging, the strip down the thumb,[1] while its chevron

---

1. This thumb strip became a hotly contested factual issue because of its similarity to the Isotoner design—was it originally part of the design, was it functional, was the Fownes testimony consistent on the subject. I find it was not an original part of the design, but it was not

design contains double chevrons used in a different fashion on a different portion of the glove. From all these factors including the knowledge held by the officers of Fownes and all the facts and the demeanor of the witnesses, and all the facts and circumstances in evidence, I infer that Fownes sought to come as close to the Aris glove as possible without infringing a mark it considered weak and possibly unenforceable. Fownes sought to come as close to the buoy as possible without hitting it.

Both Aris and Fownes presented the testimony of experts who designed and had conducted mall intercept studies to demonstrate the presence or absence of a likelihood of consumer confusion between the two brands. The resolution of such likelihood is blurred, of course, by Aris's extensive advertising of its one-size-fits-all model, the possibility that the participants in the Aris test were influenced by the type of glove rather than its design. Fownes' test tended to demonstrate that any spandex glove with a V design would be likely to be confused, just from design and construction features, with the Aris glove.

There was no direct evidence of consumer confusion except from a knowledgeable Aris employee, formerly a buyer for major department stores. Perforce this testimony was of a hearsay quality and the difficulties presented by Aris's advertising as revealed by the tests may have been present and, of course, even the most dedicated truth teller could be subconsciously affected by present persuasions and convictions derived from the choice of recent employment. There was, perhaps, quite understandably, no direct evidence of a lack of confusion by consumers in a real market situation, nor direct evidence of the presence of confusion.

## CONCLUSIONS OF LAW

■ Aris's claims are for trademark and trade dress infringement pursuant to the Lanham Act, 15 U.S.C. §§ 1051–1127, and

for unfair competition under state law. A claim is also asserted under the New York anti-dilution statute, N.Y.Gen.Bus.L. § 368–d. The crucial issue in the infringement and unfair competition claim is "whether there exists a likelihood that an appreciable number of ordinary prudent purchasers will be misled, or simply confused, as to the source of the goods in question." *Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d 251, 153 (2d Cir. 1982).

Aris notes that a newcomer's use of a mark similar to a registrant's mark on goods in direct competition presumptively establishes a likelihood of confusion, particularly where the junior user has no reasonable explanation for coming so close to the mark. *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 687 F.2d 563, 569 (2d Cir.1982); *American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 107 (2d Cir.1978). Aris is the senior user of and the only user with trademark rights in the double chevron on gloves, and as found above, Fownes' product was introduced to compete with Aris's product.

Our Court of Appeals has stated that "the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer." *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d Cir.1980), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1983) (quoting *Harold F. Ritchie, Inc. v. Cheseborough-Pond's Inc.*, 281 F.2d 755, 758 (2d Cir.1960)). This obligation can readily be satisfied for, as the Second Circuit has observed:

It is so easy for the honest businessman, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which *by no possibility* can cause confusion between his goods and those of [his] competitors, that

functional, that the Fownes testimony was not consistent and that the issue was overemphasized, being one of those issues that develops in

the course of hotly contested litigation which can be explained by the emergency nature of the search for truth as well as by malevolence.

the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them.

*Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251, 257–58 (2d Cir.) (emphasis added), *cert. denied*, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962) (quoting *Florence Mfg. Co. v. J.C. Dowd & Co.*, 178 F. 73, 75 (2d Cir.1910)); *Spring Mills v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1135 (2d Cir.1982); *Perfect Fit Industries, Inc. v. Acme Quilting Co., supra*, 618 F.2d at 953.

As noted in *Perfect Fit Industries, Inc. v. Acme Quilting Co., supra,* 618 F.2d at 954:

> In assessing the likelihood of confusion to the public, an important factor is whether or not the second comer created the similar trade dress intentionally. If there was *intentional* copying the second comer will be presumed to have intended to create a confusing similarity of appearance and will be presumed to have succeeded.

(emphasis added). *See also Spring Mills, supra,* 689 F.2d at 1135–36; *Harlequin Enterprises, Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 949 (2d Cir.1981); *RJR Foods v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir.1979).

■ The presumption of confusion flowing from bad faith is a strong one. In *Spring Mills, supra,* the Second Circuit reversed a decision for defendant primarily because of the trial court's "clearly erroneous" finding of no bad faith:

> We find that the district court erred in its determination that the marks Ultrasuede and Ultracashmere were not substantially similar when taken in the context of the setting in which they are displayed. Further, and more importantly, the determination that defendants did not act in bad faith when adopting their mark and trade dress was clearly erroneous. These conclusions led to the clearly erroneous finding that there was no likelihood of confusion.

689 F.2d at 1136. Once this presumption takes effect, the burden of proof shifts to defendant to show that confusion is not likely to occur. As the Ninth Circuit recently stated: "A latecomer who adopts a mark with intent to capitalize upon a market previously developed by competitors in the field ... must at least prove that his effort has been futile." *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir.1980). *See also, Spring Mills, supra,* 689 F.2d at 1136.

■ As found above, Fownes was aware of Aris's contentions with respect to its trademark rights, aware of its own prior use of chevrons in glove design, and sought to compete with Aris without "copying," certainly in the literal sense, the Aris design. Fownes approached sufficiently close to the Aris design as to raise the possibility of confusion, but the evidence does not establish intentional copying. Thus, the presumption of confusion is not operative here, and it is appropriate to turn to whether Aris has established a likelihood of confusion with respect to its trademark claim.

### Likelihood of Confusion—Trademark Infringement

■ The commonly accepted factors relevant to an analysis of the likelihood of confusion are those enumerated in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *American Int'l Group, Inc. v. London American Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (*Polaroid* analysis proper in case of competing as well as non-competing goods); *Vitarroz v. Borden, Inc., supra,* 644 F.2d 960, 966–67 (2d Cir.1981) (same). The *Polaroid* factors are: the strength of the plaintiff's mark; the degree of similarity between the two marks; the proximity of the products; the likelihood that the prior owner will bridge the gap; the presence of actual confusion; the defendant's good faith; the quality of the defendant's product; and the sophistication of the buyers. 287 F.2d at 495.

### 1. The Strength of the Mark

■■■ The "strength" of a mark depends on its "origin-indicating" quality in the eyes of the purchasing public. As noted in *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979):

> The term "strength" as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.

For the purposes of assessing their strength, trademarks are generally classified as generic, descriptive, suggestive, or arbitrary or fanciful, with generic marks being the weakest and subject to no protection, while arbitrary or fanciful marks are the strongest. *Id.* Marks that lack distinctiveness and fall on the lower end of the scale are classified as weak and are entitled to a limited scope of protection. *See Sun Banks of Florida v. Sun Federal Savings & Loan*, 651 F.2d 311, 315–16 (5th Cir. 1981).

The use of chevrons on the back of gloves is antique and consistent throughout time. Most commonly today this usage is found on ski gloves and on Aris's glove. There is little unique or unusual about the design itself; the degree of promotion by Aris is its unique characteristic as far as this lawsuit is concerned.

In the past twelve years, Aris has sold more than $100 million worth of gloves bearing the double V trademark, whether lined or unlined, spandex or wool, and has spent several million dollars on advertising. Its advertising has always featured the double V trademark prominently. Aris has also incorporated the double V mark into its corporate logo and it utilizes a smaller version of the mark on its top-of-the-line gloves. Aris's gloves have also enjoyed a degree of unsolicited media coverage. This promotion is the element which Aris relies upon to demonstrate that it has acquired secondary meaning in its mark and that it is therefore protectible. *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, *supra*, 644 F.2d at 950; *Scarves By Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1174 (2d Cir.1976); *Parròt Jungle v. Parrot Jungle*, 512 F.Supp. 266, 269 (S.D.N.Y. 1981); *Polo Fashions Inc. v. Extra Special Products, Inc.*, 451 F.Supp. 555, 559–60 (S.D.N.Y.1978).

■■■ Fownes argues that Aris's mark is weak because it is a design mark. This contention has no merit. As Justice Frankfurter stated in *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942):

> The protection of trademarks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trademark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe what he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, the minds of potential customers, the desirability of the commodity upon which it appears.

Justice Frankfurter was referring to a registered trademark "consisting of a red circular plug embedded in the center of a heel" of a shoe. 316 U.S. at 203, 62 S.Ct. at 1023. This statement applies equally to Aris's mark.

Indeed, a blue cornflower design, originally placed on cookingware for decorative purposes, ultimately came to serve as a trademark for Corning Glasswares, *see Federal Glass Co. v. Corning Glasswares*, 162 U.S.P.Q. 279 (T.T.A.B.1969); *Anchor Hocking Glass Corp. v. Corning Glassworks*, 162 U.S.P.Q. 288 (T.T.A.B.1969), and was granted protection against infringement. *Corning Glassworks v. Jeannette Glass*, 308 F.Supp. 1321 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir.1970).

The Ninth Circuit, in an opinion written by Chief Judge Markey of the United

States Court of Customs and Patent Appeals, held that an unmarked pocket tab on the right rear patch pocket of Levi Strauss pants is a trademark strong enough to enjoin the manufacturer of Wrangler pants from using a similar tab, even though it had the famous name "Wrangler" on it. *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817 (9th Cir.1980). On the secondary meaning the Court stated:

> We need not decide whether the Strauss pocket tab device was inherently distinctive at the time of its adoption 44 years ago, for if it were not, it could nonetheless serve as a trademark, and be protected as such, if it thereafter acquired distinctiveness, a phenomenon referred to as the acquisition of "secondary meaning." The basic element of secondary meaning is a mental recognition in buyers' and potential buyers' minds that products connected with the symbol or device emanate from or are associated with the same source.

*Id.* at 820. The court affirmed the district court's finding of secondary meaning in the tab based on continuous use, high volume of sales bearing the tab, and widespread advertising directed to the mark. *Id.* at 826. Similar facts exist here.

■ A device that is ornamental has been held to be a trademark if it acquires secondary meaning. *Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 (2d Cir.1979) (cheerleader uniforms); *In re DC Comics*, 689 F.2d 1042 (C.C.P.A.1982). If it serves as an identification of source it is a trademark, regardless of whether it is also attractive. *See id.* at 1049–50; *see also Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 773 (9th Cir.1981).

■ The evidence shows that Aris's extensive advertising has imbued its mark with secondary meaning and made it memorable in the mind of the public as an indicator of source. The success of Aris's product is a further evidence that its mark possesses secondary meaning, *see, Harlequin Enterprises Ltd. v. Gulf & Western Corp., supra*, 644 F.2d at 950, as, of course, is Aris's registration of its mark with the PTO, *see American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103 (2d Cir.1978); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976); 15 U.S.C. § 1052(f).

### 2. Similarity of the Marks

■ The best analysis of the similarity of the designs is simply to observe them. The Aris mark is made of perforated leather strips forming parallel chevron shapes appliqued to the center of the back of a spandex glove. Fownes' Vibrance Plus bears two parallel chevron shapes made of leather strips with perforations affixed to the back of a spandex glove, smaller in shape and located toward the wrist and part of two parallel bands that run along the wrist.

■ The likelihood of confusion in a side-by-side comparison of the gloves is slight, but the proper test is whether confusion is likely when a consumer, familiar to some extent with plaintiff's mark, is presented with defendant's goods alone. *Paco Rabanne Parfums, S.A. v. Norco Enterprises, Inc.*, 680 F.2d 891, 893 (2d Cir.1982), (quoting *American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 107 (2d Cir.1978)). *See Spring Mills, Inc. v. Ultracashmere House, Ltd., supra*, 689 F.2d at 1133. In these circumstances, a consumer might well believe that Fownes' gloves were in fact the Isotoner double chevron glove due to the similarity of the designs. Equally likely, particularly in light of Aris's different uses of double chevrons, is that a consumer would believe that the Fownes glove was a new model of glove from the same company which made the basic double chevron glove. This latter confusion could arise as well even in a side-by-side comparison. This conclusion is derived not from any evidence presented from a consumer but simply from viewing the articles.

Further, in assessing the degree of similarity between two marks it is the effect upon prospective purchasers that is impor-

tant. *Spring Mills v. Ultracashmere House, Ltd., supra,* 689 F.2d at 1130 (quoting *McGregor-Doniger, Inc. v. Drizzle, Inc., supra,* 599 F.2d at 1133). Thus, the setting in which a designation is used, because it affects the appearance and colors the impression conveyed by the mark, must be analyzed.

The simplicity of the perforations in the leather strips, identical details such as the strip above the thumb, the use of a window box through which the double chevrons are clearly visible, and the slogan, "the glove with the built-in tingle" all serve to heighten the possibility of confusion with Aris in the minds of consumers. The fact that Fownes' double chevrons are slightly smaller and that there are straight lines of perforated leather strips on either side of the double V does not affect the likelihood of confusion as to the origin of the Fownes product.

■ The fact that Fownes' gloves bear the Fownes name is not sufficient to dispel the overall impression of similarity between the products. Consumers may not ever know the name Aris or Fownes. Thus, in *Spring Mills, supra,* the court found error in the trial court's ruling that the name of the manufacturer on the hangtags significantly distinguished defendant's mark from plaintiff's. 689 F.2d at 1133.

As is all too frequently the case, both Aris and Fownes presented experts who conducted controlled mall intercept studies and who reached divergent conclusions. No evidence was presented of any similarity reported by consumers in a market setting. The difference in the results reached turned upon the gloves presented to those interviewed. When the spandex gloves competing with the Isotoner were used in the survey an impressive degree of confusion, or similarity if you like, to the Isotoner was noted.

The surveys taken together reinforce the not surprising conclusion that Aris' substantial advertising campaign in all media has been successful and that the similarity results not so much from the use of the chevron design as much as from the familiarity of the consumer, consciously or otherwise, with Aris and its products.

### 3. Proximity of the Products

■ As found above, Aris and Fownes compete directly in the same market. No distinctions were brought to the court's attention with respect to marketing techniques, other than Aris's extensive advertising, consumer profile, or types of outlets for the gloves. The close competitive proximity of the products weighs in favor of a finding of likelihood of confusion.

### 4. Actual Confusion

No direct evidence of consumer confusion in a marketplace setting was presented. As has already been noted, the mall intercept studies reflect primarily the tendency of Aris's advertising to associate the double chevron with its one-size-fits-all type of glove.

No statistical data was presented with respect to Fownes' sales of Vibrance Plus gloves which tended to establish on the basis of comparability that Fownes has benefitted from any confusion in the marketplace.

### 5. Quality of the Product

No testimony was offered to distinguish the two gloves in terms of quality and to this observer the quality seemed comparable.

### 6. Sophistication of the Buyer

No data was presented with respect to the sophistication of buyers of gloves for women. Day-to-day observation by one who lives, works and all too occasionally shops with women compels the conclusion that the buyers are discriminating and motivated by utility (one size fits all), familiarity, and appearance.

### 7. Good Faith of Defendant

As noted, the evidence does not establish that Fownes acted in bad faith, as opposed to a good faith attempt to come as close as it could but not too close.

### 8. Conclusion

█ The mark is not inherently distinctive, but it has acquired secondary meaning and it is therefore protectable. It is a prior mark and the design is similar though not identical. The products, however, are virtually identical. From visual observation it is apparent that sophisticated buyers, confronted with the two gloves of comparable quality with the similarities of the chevron design might conclude erroneously that they emanated from a common source, despite the different name, given the similarity of the presentation and the qualities attributed to the gloves. There is no evidence of bad faith, only of close competition. I conclude, therefore, that a likelihood of confusion between Aris's trademark as employed on its glove and the Fownes design on its Vibrance Plus style 1583 glove has been shown.

### Likelihood of Confusion—Trade Dress Infringement

█ With respect to Aris's claim of trade dress infringement, the analysis performed above for trademark infringement applies equally. *See RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir.1979). One further consideration deserves comment. Just as with a claim of trademark infringement, the test of similarity in the context of a trade dress infringement claim is whether the products create the same general overall impression. *See id.* at 1060. Further, the features of the respective trade dresses should be viewed as a whole. *See Perfect Fit Indus. v. Acme Quilting Co., supra*, 618 F.2d at 955. Here, a critical additional element is the addition of the nonfunctional leather strip extended from the wrist to the thumb. This is not part of the Aris mark, but even more than the chevron design mark it creates a degree of similarity between the gloves that engenders a likelihood of confusion.

I conclude that Aris has shown a likelihood of confusion between the trade dress of its glove and the trade dress of Fownes' Vibrance Plus style 1583 glove.

### The State Claims

█ Aris also asserts state claims for trademark infringement and unfair competition, and for violation of the New York anti-dilution statute, N.Y.Gen.Bus.L. § 368-d. The infringement and unfair competition claims are adequately made out by the showing of likelihood of confusion discussed above. *See Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 930 (S.D.N.Y.1981). The New York statute authorizes injunctive relief in cases where there is a "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name." N.Y.Gen.Bus.L. § 368-d. As the New York Court of Appeals has noted, "[t]he evil which the legislature sought to remedy was not public confusion caused by similar products or services sold by competitors, but a cancer-like growth of dissimilar products or services which feeds upon the business reputation of an established distinctive trademark or name." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1165 (1977). Thus, the statute has no application here where the products are similar and competitive. *See also Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 418 n. 1 (S.D.N.Y. 1980).

### Defenses

█ Fownes argues that Aris's double chevron is not protectable because it is functional in that it provides a "slimming" or "slenderizing" effect. The evidence does not support this contention, however, and it is in any event to no avail since a functional feature may also serve a trademark purpose where, as here, it has acquired secondary meaning. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 203–04 (2d Cir. 1979); *In re DC Comics*, 689 F.2d 1042, 1045 (C.C.P.A.1982).

### The Relief

█ In consideration of all the foregoing, and in particular, the conclusion that a

likelihood of confusion exists between the Aris mark and the Fownes Vibrance Plus style 1583 glove design, as well as between the respective trade dresses utilized by the parties, I conclude that the balance of the equities weighs in favor of injunctive relief. Aris has developed a protectable trademark and trade dress and its considerable good will deserves preservation. Fownes, on the other hand, while it can capitalize on a market or fad created by another, it cannot do so at the expense of confusing the public. *See American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 662 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). A likelihood of such confusion exists here.

Therefore, an injunction will issue enjoining Fownes from the use of a double chevron design in connection with its gloves, and specifically in connection with its Vibrance Plus style 1583 glove. This injunction shall not be construed to restrain Fownes from using a single chevron design, provided that it is not confusingly similar to Aris's double chevron. The injunction shall take effect sixty (60) days from the date judgment is entered to enable Fownes to phase out its current style.

Aris's claims for an accounting and for attorneys' fees will be denied. As found above, the evidence does not establish bad faith or intentional infringement and the balance of the equities does not support such relief.

No costs will be awarded. Submit judgment in accordance with this opinion within twenty (20) days of the date of filing of these findings and conclusions.

IT IS SO ORDERED.