**Per F. LARSEN d/b/a The Dinghy Place**

v.

**Ray ORTEGA d/b/a The Dinghy Dock.**

**Civ. No. N–89–302(JGM).**

United States District Court,
D. Connecticut.

Feb. 10, 1992.

Ruling on Plaintiff's Motion
to Alter or Amend Judgment
March 30, 1992.

Robert H. Montgomery, Robert H. Montgomery, P.C., New Haven, CT, for plaintiff.

Charles Graham, Annunziata and Grillo P.C., New Haven, CT, for defendant.

## MEMORANDUM OF DECISION

MARGOLIS, United States Magistrate Judge.

On June 23, 1989, plaintiff Per Frigast Larsen, d/b/a The Dinghy Place, commenced this four-count action against defendant Raymond–Edward Ortega, d/b/a The Dinghy Dock, alleging trademark infringement in violation of 15 U.S.C. § 1114 (Count I), false designation of origin in violation of 15 U.S.C. §§ 1121 & 1125(a) (Count II), unfair competition (Count III), and violation of the Connecticut Unfair Trade Practices Act ["CUT-

PA"], Conn.Gen.Stat. § 42–110a *et seq.* (Count IV). On September 22, 1989, defendant Ortega filed his answer, with two special defenses, *i.e.*, permitted use and estoppel, along with a counterclaim under CUTPA.

On September 6, 1991, the parties consented to a court trial before this Magistrate Judge, with any appeal to be taken directly to the Second Circuit. (Dkt. # 40). On September 24, 1991, the parties filed their lengthy Joint Response to Standing order Regarding Trial Memoranda in Civil Cases (Dkt. # 44), which response included a forty-four paragraph stipulation of facts ["Jt.Stip."]. A four-day trial was held on October 7–10, 1991, at which nine witnesses testified.[1] Post-trial briefs were submitted by plaintiff on November 22, 1991 and December 6, 1991 (Dkt. ## 50 & 55) and by defendant on December 4, 1991 (Dkt. # 53).[2]

For the reasons stated herein, judgment may enter for Larsen on his complaint and on Ortega's counterclaim.

## I. FINDINGS OF FACT

The following constitutes the Court's findings of fact pursuant to F.R.Civ.P. 52(a):

Around 1980, Arthur F. Ferguson ["Ferguson"] founded The Dinghy Place, located at 16 Old Post Road, Westbrook, Connecticut; in May 1980, he obtained Registration No. 1,209,259 for the tradename and service mark "The Dinghy Place." (Jt.Stip. ¶¶ 5–7; Exhs. A–B). Such registration has been in continuous use since then, is in full force and effect until September 14, 2002, and is incontestable under 15 U.S.C. § 1065. (Jt.Stip.

¶¶ 5, 7, 10). The trademark specifically provides that "No claim is made to exclusive use of 'Dinghy' apart from the mark as shown." The mark consists of the three words "The Dinghy Place," in which a drawing of a dinghy, pointing to the left, is substituted for the capital letter "D" in "Dinghy," followed by a series of wavelets immediately to the right of the word "Place." (Exh. A).

The Dinghy Place is one of the largest dealers of small boats in New England, concentrating on small sail boats, row boats, canoes, inflatable boats, and other marine supplies and accessories. (Jt.Stip. ¶ 8; Exhs. W, KK). The Dinghy Place has built up substantial good will and has a high reputation. (Jt. Stip. ¶ 9). Larsen described it as a "niche business." (*Tr.* 142, 144). The prices of these boats start at approximately $250 for an unpainted wooden frame, with inflatables ranging from $710 to $9,000, rowing dinghies from $500 to $700, and sailing dinghies from $1,050 to $1,450. (*Id.* 89–90). The purchasers of such boats generally fall into two distinct categories—(1) the first-time buyers, who require "tactful advice," and (2) experienced yachtsmen, who consider themselves "absolute experts" and who are very knowledgeable and "keen shoppers." (*Id.* 90–91, 145–46). The latter category of purchasers far outweighs the former. (*Id.* 146). Larsen considers The Dinghy Place's sales area to include the entire state of Connecticut, the remaining New England states, New York, and New Jersey; he has placed sales with customers as far away as Virginia and Wisconsin. (*Id.* 27–28).

---

1. The trial transcript from October 7, 1991 was filed on December 4, 1991 (Dkt. # 54) ("*Tr.*"), consisting of pp. 1–135; the transcript from October 8, 1991, was filed on January 24, 1992 (Dkt. # 57) ("*Tr.*"), consisting of pp. 1–169; the transcript from October 9, 1991 was filed on February 5, 1992 (Dkt. # 58) ("*Tr.*"), consisting of pp. 1–120; and the transcript from October 10, 1991 was filed on February 6, 1992 (Dkt. # 59) ("*Tr.*"), consisting of pp. 1–63.

   The three critical witnesses—Larsen, Ortega, and Arthur Ferguson—were called by both sides. Additional witnesses for Larsen included Stephen Krochta, a college student who was a customer of the Dinghy Place; Shirley Larsen, plaintiff's wife; Tracy Wilson, Mrs. Larsen's daughter; and Jack Ruskin, another customer, whose post-trial deposition transcript was admit-

   ted as plaintiff's Exh. LL. Additional witnesses for Ortega were Attorney Anthony DeLio, who testified as an expert witness; and Leonard Morano, who designed, built, and installed Ortega's Milford sign. No reference will be made to the trial transcripts to the extent such information appears in the Joint Stipulation of Facts.

   Larsen submitted Exhs. A–EE, GG–LL, and Ortega submitted Exhs. 1–14.

2. In his seventy-eight page brief, Larsen quoted extensively from this Magistrate Judge's prior memorandum of decision in *Penta Hotels Ltd. v. Penta Tours, Inc.*, 1988 WL 384940, 1988 U.S.Dist. LEXIS 15713, 9 U.S.P.Q.2d 1081 (D.Conn.1988), affirmed on appeal on July 17, 1989. Ortega's brief is fourteen pages long.

The Dinghy Place has two large signs facing the Post Road in Westbrook: (1) a long rectangular sign affixed to the building with its trademark and the words "WORLD HEADQUARTERS," followed by the registration sign (an "R" inside a circle) (Exhs. D–1 & D–3) and the other a squarish freestanding sign, again with the trademark, with the words, "DINGHIES," "DAYSAILORS," "INFLATABLES," "CANOES," "OUTBOARD MOTORS," "TRAILERS," and "HARDWARE" beneath it. (Exh. D–2). The background of both signs is white, with blue lettering upon it. (*Tr.* 120).[3]

In March 1988, Ortega approached Ferguson with regard to Ortega opening a similar store of his own; Ferguson convinced Ortega to become a part-time employee at The Dinghy Place in order to learn the business. (Jt.Stip. ¶¶ 16–18, 25, 32–33). Ferguson taught Ortega all aspects of this business and became Ortega's "mentor" as a result. (*Id.* ¶ 18). During the spring of 1988, Ferguson and Ortega discussed the possibility of Ortega opening a branch of The Dinghy Place in a location west of New Haven. (*Id.* ¶¶ 20, 34). Ferguson suggested that Ortega have an attorney draft a franchise agreement, which would form the basis of any further discussions between them; Ferguson wanted Ortega to take the initiative, in order to demonstrate his good faith in any future transaction. (*Id.* ¶ 20; Tr. 19–21, 23, 99–100). On May 10, 1988, Ortega's attorney forwarded to him a draft of a license agreement, under which Ortega could use the name "The Dinghy Place," provided that he purchase all his inventory from Ferguson at five percent over Ferguson's cost. (Jt.Stip. ¶¶ 21, 35; Exhs. G–H). This agreement never was executed, as Ferguson claimed he had difficulty in finding an attorney with expertise in franchise law and Ferguson was entering his busy season. (Jt.Stip. ¶ 36; Tr. 111–12).

The relationship between Ferguson and Ortega thereafter is an ambiguous one, which ambiguity forms the basis for this lawsuit. After Ortega found a suitable location in Milford, he had discussions with Ferguson about using the name "The Dinghy Dock"; Ortega testified that he liked the alliteration, as the name had "a certain ring to it." (Jt.Stip. ¶ 37; Tr. 51–52). Ferguson testified that he was not pleased with that name and discouraged Ortega from using it, but that he did not reject it outright. (Tr. 94–95, 112–13). On May 23, 1988, Ortega applied for, and did receive, a sales tax permit for "The Dinghy Dock." (Jt.Stip. ¶¶ 30–31).

On June 1, 1988, Ortega opened his store, located at 512 Boston Post Road, Milford, Connecticut for business, under the name "Milford Marine—The Dinghy Dock." (*Id.* ¶ 30; Tr. 28–29). It carried a line of products identical to that of The Dinghy Place. (Jt.Stip. ¶¶ 13, 19, 27).[4] Ortega obviously was aware of the existence and high reputation of The Dinghy Place. (*Id.* ¶ 14). Between June 1988 and October 1988, Ortega purchased his inventory from Ferguson (Exhs. 3–4); The Dinghy Place's invoices listed the customer either as "Milford Marine/T.D.D." or simply as "Milford Marine." (Exh. 4). Ortega and Ferguson operated under an "oral understanding," under which Ortega would purchase his inventory from Ferguson at five percent over Ferguson's cost, precisely as set forth in the unexecuted draft franchise agreement. (Tr. 56, 104). Ferguson believed that by increasing his own purchases from the manufacturers, such an arrangement would enhance his relationship with his own suppliers. (Tr. 103–07). Ferguson allowed Ortega to use his name as a sponsor for membership in the Connecticut Marine Trade Association ["CMTA"]. (Jt.Stip. ¶ 38; Exh. 2).

When the store opened, Ortega used a blue-and-white business card which he designed himself, on which a dinghy facing left

---

3. As often occurs with reprints, Exhs. D–1 through D–3 have a bluish or greenish tint to them.

4. There was a great deal of testimony regarding which other stores in Connecticut compete with The Dinghy Place and The Dinghy Dock. (*Tr.* 19–22; Tr. 24–26, 52–53, 54–56, 76–80, 105–14;

*Tr.* 23, 25–27, 28–30, 32–35; Exhs. S–Z, 8, 11, 12). Based upon the testimony of the parties, it would appear that of the numerous other stores in Middlesex, New Haven, and Fairfield Counties which sell dinghies, the two parties are the only ones which specialize exclusively in small boats.

appears in lieu of the "D" in both words "Dinghy Dock"; the card also indicates that the store sells "Canoe, row, sail, inflatables & accessories." (Exh. L; Tr. 26–27). Ortega concedes that this business card "substantially copied" plaintiff's registered service mark. (Jt.Stip. ¶ 15).

When the Milford store initially opened, apparently there was no large sign above it, but merely a sandwich-board free-standing sign. (Tr. 79, 110–11). In early June 1988, Ortega met with Leonard Morano, the principal of Sign Maintenance Co. in Bridgeport, who designed a sign for Ortega. (*Tr.* 4–5, 12–13; Exhs. 9–10). Morano testified that he never saw plaintiff's service mark before. (*Tr.* 7, 13–14). Morano conceded, however, that in the initial pencil sketch of the sign, done with Ortega present, the capital "D" does resemble a boat, and recalled that Ortega had made that suggestion. (*Id.* at 14, 16–17, 18). The final sign, which was installed by Morano in early June 1988 (*see* Exh. 10), reads in large blue letters, "THE DINGHY DOCK," with one large "D" commencing both words. (Exh. E). To the right, in significantly smaller letters, are the two words "MILFORD MARINE." Directly beneath all five words is a series of blue wavelets, with the words "INFLATABLES. ROWERS. SAILERS. CANOES. OUTBOARDS. TRAILERS. ETC." (*Id.*) Morano testified that the large "D" comes from a standard typeset book, and that he had suggested the blue color and wavelets, which are common for marine products. (*Tr.* 5–6, 14, 19).

Ferguson placed two advertisements in the July 1988 issue of *Soundings,* a nautical publication sold on newsstands and is directed to the boating public. (Jt.Stip. ¶¶ 22–24). This issue was available for distribution in late May 1988. (*Tr.* 13). The first ad announced: "Coming soon to Milford ... a second location on the Post Rd. Milford, CT," with The Dinghy Place service mark, with the registration sign, directly beneath it. (Exh. I; Jt.Stip. ¶ 24). The second ad, which appeared only in the trade edition of the publication, read as follows:

ONE OF A KIND SMALL BOAT business established 8 years, in the heart of Conn's. [sic] boating country. Room for expansion. Business, inventory, showroom, house. $550K. Reply Box QA, Soundings, Essex, Conn. 06426–1185....

(Exh. R; Jt.Stip. ¶ 23). Ferguson explained his motivation behind these two somewhat contradictory ads as follows: it was his expectation that he would not find a potential buyer for approximately one to two years, that it would take another year to consummate the deal, and that the value of the business would be enhanced by having the second location in Milford. (Tr. 90–92).

Larsen read the second advertisement on or before Wednesday, May 25, 1988. (Jt.Stip. ¶ 23).[5] Larsen had extensive experience in the graphics field and in nautical matters prior to emigrating from Denmark in 1975. (*Tr.* 7–9, 11–13, 116–18). He has a number of business interests in this country, including three businesses which retail marine products, so that The Dinghy Place was "compatible" with Larsen's other investments. (*Id.* 9–11, 123–24). Larsen contacted *Soundings* and shortly thereafter received a response from Ferguson; on Friday, May 27, 1988, Mr. and Mrs. Larsen met Ferguson at The Dinghy Place. (*Id.* 13). Both Larsen and Ortega recalled having been briefly introduced at that time. (Tr. 58; *Tr.* 128). Negotiations between Larsen and Ferguson continued during the summer, including the exchange of financial information and conferences with accountants. (*Tr.* 124–26).

Ortega assisted Ferguson at The Dinghy Place's booth at the Clinton Boat Show in July or August 1988; Ortega earned a commission for the boats which he sold and customers were given an option to pick up their purchases at either Westbrook or Milford. (Jt.Stip. ¶¶ 40, 42). Ferguson emphasized that this arrangement was advantageous to him, for it is important for a boat retailer to sell as much inventory as possible prior to the winter months, when sales are slow. (Tr. 116–17). Ortega testified that although the name displayed on the booth was that of The Dinghy Place, he *did distrib-*

---

**5.** This paragraph of the Joint Stipulation con-     tains an obvious typographical error.

ute his Dinghy Dock business cards while there. (Tr. 58).

Ferguson and Ortega maintained the same arrangement at the Stamford Sailboat Show in September 1988, whereby each customer had the option to pick up the purchased merchandise at either the Westbrook or Milford location. (Jt.Stip. ¶¶ 41–42). The Dinghy Place shared its booth with Starwing, Inc., a manufacturer of Pilot and Point Jude dinghies (*see* Exh. 7), which are sold by The Dinghy Place. (Tr. 96–97, 117; *Tr.* 29–30). Larsen also was at this popular boat show for Optimist Dinghy, one of his own businesses; while there, he paid a social visit to The Dinghy Place's booth and chatted with Ferguson, Ortega, and Jeff Brainard of Starwing, who was the first vendor Larsen met. (Tr. 58–59, 120; *Tr.* 29–30, 126–27, 131–33).[6]

On November 1, 1988, Larsen purchased The Dinghy Place from Ferguson for a total of $235,000, which included $125,000 for the commercial building, $15,000 for a restrictive covenant, $20,000 for fixtures, $60,000 for the trade name, and $15,000 for good will. (Exh. 1). By virtue of a Trademark Assignment, dated April 14, 1989, and a Supplemental Trademark Assignment, dated October 1, 1991, Registration No. 1,209,259 was as-signed from Ferguson to Larsen, effective as of November 1, 1988. (Jt.Stip. ¶ 5; Exhs. C, C–1).

Larsen and Ortega saw one another again at the November 1988 meeting of the CMTA, which had been scheduled to discuss the upcoming New Haven Boat Show in January 1989. (Tr. 59; *Tr.* 30–31, 128–29, 133). Ortega testified that at that meeting, Larsen agreed to extend the oral arrangement Ortega had with Ferguson; Larsen testified, in contrast, that it was Ferguson who had suggested an extension of that courtesy. (Tr. 59–60; *Tr.* 133–34).

The next encounter between the parties did not occur until Sunday, January 22, 1989, when Larsen was operating The Dinghy Place's booth at the New Haven Boat Show and Ortega was assisting at the CMTA's nearby booth. (Tr. 61–63; *Tr.* 31, 46, 135). A customer approached Larsen with respect to reducing his sales price on an Achilles inflatable boat; when the customer protested that "your own shop in Milford" already had quoted him a lower price, he retrieved The Dinghy Dock's card from his pocket for Larsen.[7] (*Tr.* 31, 34–35, 40–43). Larsen there-after showed the card to Ferguson, who was assisting Larsen that day; Ferguson never

---

**6.** Neither Ferguson nor Larsen recalled the Dinghy Dock having a separate sign at the exhibition booth. (Tr. 97; *Tr.* 132–33). Ferguson was shown a reproduction of three photographs taken at the Stamford boat show, which included some small signs on the display boat, which reproduction was marked as Exh. 5; Ortega was going to submit an enlargement of these photographs. (Tr. 117–19, 128–29). No such submission ever was made. On December 6, 1991, Larsen filed an objection to this exhibit and to any consideration of testimony relative to the alleged sign. (Dkt. # 56). Larsen's objection is sustained with respect to any belated attempt to introduce the enlargement, but is overruled in all other respects. The record as it exists now is obviously inconclusive.

**7.** Defendant objected to the introduction of this conversation (and similar evidence) as constituting inadmissible hearsay. This objection was overruled (*see Tr.* 37–39), on the basis of *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 386, 388 (S.D.N.Y.1985), *aff'd mem.*, 788 F.2d 2 (2d Cir.1986):

> Generally speaking, an infringement plaintiff undertakes to prove actual confusion between his and the defendant's product in two ways:

anecdotal evidence of particular events, and market research surveys. . . .

. . . . .

The bulk of plaintiffs' anecdotal evidence of actual confusion consists of testimony of a number of witnesses about what other persons asked them or said to them.

The declarants themselves did not testify; thus in most cases we do not know why they asked what they asked or said what they said. These declarations are not barred by the hearsay rule. An inquiry is not an "assertion," and accordingly is not and cannot be a hearsay statement. Rule 801(a), (c), F.R.Evid. Statements of the declarant's then-existing state of mind fall within the exception of Rule 803(3). However, the probative value of such declarations is reduced by uncertainty as to what induced them. In a case where the issue is whether defendant's mark caused confusion, "[t]he relevant question ... is what induced [the] state of mind" revealed by the declaration.

(citations omitted). *See also Transamerica Corp. v. Trans America Abstract Service, Inc.*, 698 F.Supp. 1067, 1075 (E.D.N.Y.1988); *Lobo Enterprises, Inc. v. Tunnel, Inc.*, 693 F.Supp. 71, 77 (S.D.N.Y.1988).

had seen this card before either. (Tr. 80, 125; *Tr.* 43–44, 136–37). At this point, Larsen, who was admittedly upset, informed Ortega that the situation was "unacceptable" to him, particularly since he had purchased The Dinghy Place only a few months earlier; he suggested a number of resolutions, including that Larsen acquire an interest in the Dinghy Dock, but that failing an amicable resolution, he would seek a cease-and-desist order against Ortega. (Tr. 63–64; *Tr.* 46–47, 135–37).

The next day, Monday, January 23, 1989, Larsen went to Ortega's store in Milford, where he reviewed the inventory there;[8] Larsen testified that he was in "a bit of shock," for The Dinghy Dock was a "total copycat" of Larsen's operation and presentation of merchandise. (*Tr.* 45–46, 138–39; Tr. 57–58). After waiting for Ortega to finish his meeting with a mast vendor (Tr. 64–65; *Tr.* 138; Tr. 58, 81–82), Ortega and Larsen had a conversation, the contents of which are much in dispute. Ortega testified that Larsen said angrily that he considered his Achilles territory to run from Maine to New Jersey, that he had instructed his vendors three weeks earlier not to sell to Ortega anymore, that Starwing had lied to him, as they promised that they weren't making any more sales to Ortega, that Larsen was going to pull his orders from Starwing if it continued to sell to Ortega, and that Ferguson had lied to him, and then inquired if Ferguson was a partner in this store. (Tr. 64–65; Tr. 82–85, 99). Larsen emphatically denied having had any "long and interesting conversation" with Ortega that day, and in particular denied having made the statements with respect to scope of his territory, the instruction three weeks earlier to vendors (particularly since he was not even aware of the store's existence at such time), and having insinuated that Ferguson was a liar. (Tr. 58–60, 101).

Later that day, before Larsen had an opportunity to contact his attorney, Ferguson visited with Larsen at The Dinghy Place; they both agreed that it would be better for Ferguson to approach Ortega, since he had a prior relationship with him. (Tr. 124–25; *Tr.* 44, 140). Ferguson then telephoned Ortega at home, with Larsen listening only to Ferguson's end of the conversation; during such telephone call, Ortega agreed to modify his business card, but refused to change his sign due to the expense involved. (Jt.Stip. ¶¶ 43–44; Tr. 66–67, 71–72, 123–24, 126–27; *Tr.* 44–45, 139–41). Shortly thereafter, Ortega began to circulate a new business card (Exh. JJ), which was in use until June 1990. (Tr. 12). This card, also in blue and white, provided in small letters "MILFORD MARINE" with wavelets to the left and right of these words. The remainder of the business card was substantially similar to the sign above the Milford store. (Exh. E).

On or about February 10, 1989, Larsen's attorney forwarded a letter to Ortega (Jt.Stip. ¶ 26;[9] Exh. J), followed by a telephone call on April 12, 1989. (Tr. 33). Ortega's counsel responded in a letter dated June 1, 1989. (Jt.Stip. ¶ 26; Exh. K).

In June 1990, Ortega relocated his store to 3 First Avenue, West Haven, Connecticut. (Jt.Stip. ¶¶ 28–29). The design of his new business cards (Exh. II) and his new sign (Exh. F) are similar to those used at his Milford location, with the exception that he now utilizes the name "HARBOR MARINE" instead of "MILFORD MARINE."

The Dinghy Place advertises in a number of publications, including *Soundings* (see Exh. HH), occasionally in the *Bargain News*, *Shoreline Times, Best Boat Buys*, and special boating supplements in local newspapers. (*Tr.* 22–23). The Dinghy Place also advertises in numerous telephone directories, including Bridgeport, Cheshire, Clinton–Madison–Guilford, Farmington Valley, Hartford, Meriden, Middletown, Milford, New Haven, New London, Norwalk, Norwich, Old Saybrook, Stamford, and Waterbury. (*Id.* 24–27; *see, e.g.,* Exhs. T, V, W, X, Y, Z). Exclusive of amounts associated with the various annual boat shows, Larsen expended approximately $13,000 to $14,000 on advertising in 1989, $19,000 to $20,000 in 1990, and $8,000 to $9,000 in the first half of 1991. (*Tr.* 28–29).

8. Larsen mistakingly believed that this event occurred on Tuesday (*Tr.* 139; Tr. 57), which varies with both Ortega's and Ferguson's recollections.

9. *See* note 5 *supra*.

The Dinghy Dock similarly advertises in the telephone directories for Bridgeport, Milford, and New Haven (*see, e.g.,* Exhs. S, U), as well as in *Bargain News* and Yale directories. (Tr. 36–38).

There was testimony regarding confusion between these two stores on the part of vendors, publications, and customers. At least two shipments from manufacturers have been misdirected—one where oars ordered by The Dinghy Place from Pastimo USA, Inc. erroneously were shipped to The Dinghy Dock and another where a fiberglass boat ordered by The Dinghy Dock from Great Canadian erroneously were delivered to The Dinghy Place. (*Tr.* 49–51, 53–54, 62; Exhs. M, O). In addition, the "Certificate of Excellence" awarded by Achilles to The Dinghy Place for being among Achilles' top twenty dealers in the eastern part of the United States and Canada listed the store's place of business as being Milford, Connecticut. (*Tr.* 61–62; Exh. N). Similarly, Wilson testified that in May 1990 she attempted to place an advertisement for The Dinghy Place in a special boating safety supplement to be published by the *Milford Citizen* the next month, only to be informed that her store, The Dinghy Dock, already had supplied the necessary information. (Tr. 4–5, 6–7; Exh. P).

There was direct testimony as to customer confusion by Krochta, a college student who owns an inflatable boat, enjoys scuba diving, and attends to lobster pots. (Tr. 4–5). He testified that he was aware of The Dinghy Dock's advertisement in an older edition of the Milford Yellow Pages and had been by its West Haven store; while driving down the Boston Post Road (Route 1) in Westbrook in July 1991, he noticed The Dinghy Place and stopped there because he believed that the two stores were associated. (*Id.* 5–8, 9–13). He believed that the Yellow Pages ads for the two stores were confusingly similar, as were the facades of the buildings in which the stores were located. (*Id.* 8–9).

Ruskin, another boating enthusiast, testified that he'd been familiar with the Dinghy Place for three or four years, as he is employed in Westbrook and had passed by the store many times. (Exh. LL, at 4–6). He was also familiar with Ortega and the Dinghy Dock and testified that in July 1988, Ortega told him at the Clinton Used Boat Show that the two stores are "affiliated. We work together." (*Id.* at 6–8, 9–11). In January 1990, Ruskin met the Larsens at the New York Boat Show, where he relayed on to them Ortega's prior statement that the two stores were affiliated. (*Id.* at 8–9).[10]

Mr. and Mrs. Larsen both testified to at least twenty separate incidents of customer confusion at the various boat shows, during telephone inquiries, or at The Dinghy Place itself from February 1989 until May 1991. (*Tr.* 47, 97, 101–02, 112, 113016, 154–55, 156–59; Exh. Q).

■ Larsen opined that the general impact of the service marks at dispute are the same, for both marks have the same color scheme, both include wave lines, both name the same or similar product lines, and the stylized large "D" in Dinghy Dock represents the bow of a boat. (*Tr.* 118–19, 120–22, 143, 150–51). Speaking strictly as a sign designer, Morano did not find the two signs to be confusing, as they utilize different type styles. (*Tr.* 7–10, 19–20). Ortega's expert witness, Attorney DeLio, testified that on July 11, 1991, he obtained a data base from Thompson & Thompson in Boston, Massachusetts, and uncovered six companies other than Larsen's business which begin with the word "dinghy." (*Tr.* 73–74, 79–81; Exh. 6). These businesses, however, are all located in California, Florida, and Louisiana. (Exh. 6). Attorney DeLio opined that The Dinghy Dock's service mark does not infringe upon The Dinghy Place's registered service mark. (*Tr.* 76, 83–87; Exh. 6).[11]

---

10. *See* note 15 *infra*.

11. The Court has no reservations about Attorney DeLio testifying as an expert which respect to his investigation into other "dinghy" formatives. There is little doubt that expert testimony on the strength of a plaintiff's trademark or on the degree of similarity within a discreet industry is appropriate. *See, e.g., PAF S.r.l. v. Lisa Lighting Co., Inc.,* 712 F.Supp. 394, 401 (S.D.N.Y.1989) (expert on the aesthetics of a high-tech halogen desk lamp, which lamp became the number one or number two best-selling desk lamp in the country); *Essence Communications, Inc. v. Singh*

With respect to Ortega's counterclaim, as previously mentioned, Ortega testified that during the January 23, 1989 discussion held at The Dinghy Dock, Larsen stated that three weeks earlier he had instructed Ortega's vendors to cease doing business with the Milford store, specifically mentioning Achilles and Starwing. (Tr. 64–65; Tr. 82–85). Larsen denied having contacted Achilles (Tr. 69–70) and Ortega conceded that the very next day, January 24, 1989, he became an authorized Achilles dealer. (Tr. 90–91).[12]

Larsen testified that on January 30, 1989, he was visited by Jeff Brainard of Starwing, to discuss Larsen's spring dating orders. (Tr. 59–62). Larsen requested clarification from Brainard as to what was The Dinghy Place's exclusive territory, as he recently had come across a "copy-cat operation." (Id. 62–63). Larsen testified that on his own initiative, Brainard volunteered to stop supplying Ortega until the matter was resolved. (Id. 63–64). Brainard sent a confirmation letter later that day, in which he pledged: "My commitment to you also is that as long as you are in litigation over this issue with The Dinghy Dock and it's [sic] logo, I will not ship to that location." (Exh. 7). The prior week, Ortega telephoned Steve Brainard, Jeff Brainard's brother, to discuss his spring dating orders; he had the impression, from Steven Brainard, and from Gino, who replaced Jeff Brainard, that Starwing was "stalling" him. (Tr. 85–90, 97–98). Ortega admitted, however, that Starwing never "specifically rejected" any orders he placed. (Id. 97).

Larsen explained that during the spring of 1989, Starwing ceased production, due to a familial dispute between its majority owner, Alex Brainard, and one of his sons. (Tr. 101–02). During the summer of 1989, Larsen contacted Alex Brainard and in late October 1989, Mr. and Mrs. Larsen, and Mr. and Mrs. Michael Dapice[13] each purchased a twenty-five percent interest in Starwing's subsidiary, Pilot Boat Co., Inc. (Tr. 53–54, 66–67, 102–03; Tr. 31, 38, 40; Exhs. 7, 13, 14). Pilot Boat Co. manufactures the popular Point Jude Daysailer. (Exh. 13). When forwarding promotional material to Ortega on these boats during the summer of 1990, Dapice instructed Ortega in a note that Ortega was not to "stamp these circulars with your name on it. They are for information only." (Tr. 41–42, 43, 45; Exhs. 13, 14). There was no evidence, however, that Ortega ever tried to order any Point Jude boats, and Larsen testified that Pilot Boat would be willing to sell its product to Ortega. (Tr. 31).

## II. CONCLUSIONS OF LAW

The following constitutes this court's conclusions of law pursuant to F.R.Civ.P. 52(a).

### A. Trademark Issues

#### 1. COUNTS I and II

■ Larsen has alleged violations of 15 U.S.C. §§ 1114 and 1125 in his first two counts, respectively. Section 1114 prohibits the

> reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake or to deceive....

Section 1125 proscribes the "use in connection with any goods or services ... any false description or representation, including words or other symbols tending falsely to describe or represent the same...."

■ Claims under both §§ 1114 and 1125 require a showing of likelihood of confusion. *Lambda Electronics Corp. v. Lambda*

---

*Industries, Inc.*, 703 F.Supp. 261, 270 (S.D.N.Y. 1988) (experts on direct mail marketing field); *Eastern Air Lines, Inc. v. New York Air Lines, Inc.*, 559 F.Supp. 1270, 1274–75 (S.D.N.Y.1983) (well-known lexicographer testifying on derivation of the word "shuttle"). It is significantly less clear that a trademark attorney can testify as an expert witness with respect to the ultimate legal question to be determined by the court. (*See Tr.* 69–70).

**12.** In light of this testimony, the Court granted Larsen's motion for dismissal, then under F.R.Civ.P. 41(b), with respect to Achilles. (*Tr.* 49–53).

**13.** Dapice is the founder and owner of Ensign Marine, which also supplies dinghies to The Dinghy Place. (Tr. 54; *Tr.* 39–40).

*Technology, Inc.,* 515 F.Supp. 915, 924 (S.D.N.Y.1981). The determination of whether there exists a likelihood of confusion is a factual question which turns on "the probable or actual actions and reactions of prospective purchasers." *American International Group, Inc. v. London American International Corp., Ltd.,* 664 F.2d 348, 351 (2d Cir.1981). In this Circuit, "likelihood of confusion refers to confusion of *any type,* ... including confusion of source, sponsorship, affiliation, connection, or identification." *McDonald's Corp. v. McBagel's, Inc.,* 649 F.Supp. 1268, 1273 (S.D.N.Y.1986) (emphasis in original) (citations omitted).

■ In determining whether an appreciable number of consumers are likely to be misled or confused as to the source of goods in question, the court is guided by the multifactor balancing test set forth thirty years ago in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961): (1) the strength of plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the parties' products; (4) the likelihood that the senior user will bridge the gap; (5) the existence of actual confusion; (6) defendant's good faith in adopting its mark; (7) the quality of defendant's product; and (8) the sophistication of the purchasers. However, the ultimate conclusion as to whether a likelihood of confusion exists is not to be determined solely in accordance with the *Polaroid* factors; they are merely "a useful guide through a difficult quagmire." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir.1986). Moreover, no one factor is determinative and the weight to be accorded any particular factor depends upon the facts and circumstances of each case. *McGraw-Edison Co. v. Walt Disney Productions,* 787 F.2d 1163, 1168 (7th Cir.1986). The district court need not "slavishly recite the litany of all eight *Polaroid* factors ... [but] need only consider sufficient factors to reach the ultimate conclusion as to whether or not there is a likelihood of confusion." *Orient Express Trading Co. v. Federated Department Stores, Inc.,* 842 F.2d 650, 654 (2d Cir.1988).

*a. STRENGTH OF THE MARK*

■ The strength of a particular mark depends on its distinctiveness or its tendency to identify goods or services sold thereunder as originating from a particular source. *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). Registration of a trademark creates a rebuttable presumption that such mark is distinctive. *United States Trust Co. of New York v. UST Corp.,* Civ. No. B87–395(TFGD), slip op. at 9 (D.Conn. Aug. 28, 1987). *Cf. Gear, Inc. v. L.A. Gear California, Inc.,* 670 F.Supp. 508, 515 (S.D.N.Y.), *recon. denied,* 1987 WL 16954, 1987 U.S.Dist. LEXIS 8249 (S.D.N.Y. 1987), *modified by agreement on other grounds,* 1989 WL 407456, 1989 U.S.Dist. LEXIS 17312 (S.D.N.Y.1989). In his brief, Ortega made no argument with respect to the strength of Larsen's trademark; in fact, he previously stipulated that the Dinghy Place has built up substantial good will and has a high reputation. (Jt.Stip. ¶ 9). Thus, this first factor weighs heavily in Larsen's favor.

*b. DEGREE OF SIMILARITY BETWEEN THE MARKS*

■ In considering this factor, the court does not determine the likelihood of confusion by comparing the marks on a side-by-side basis. *See Spring Mills, Inc. v. Ultracashmere House, Ltd.,* 689 F.2d 1127, 1133 (2d Cir.1982). Nor is close similarity between the two marks dispositive. *McGregor-Doniger, supra,* 599 F.2d at 1133. Rather, the test is whether the consumer would know the difference between the two sources of origin if the junior user's product is *singly* presented and the consumer has heard of the senior user's product. *American Home Products Corp. v. Johnson Chemical Co., Inc.,* 589 F.2d 103, 107 (2d Cir.1978). "The test for determining similarity is whether the respective marks convey the 'same general overall impression' to the purchasing public when viewed separately." *Western Publishing Co., Inc. v. Rose Art Industries, Inc.,* 910 F.2d 57, 61 (2d Cir.1990) (citations omitted).

■ The fact that both parties' marks use the word "Dinghy" is not dispositive of the similarity factor. *Inc. Publishing Corp.*

*v. Manhattan Magazine, Inc.,* 616 F.Supp. 370, 379 (S.D.N.Y.1985), *aff'd mem.,* 788 F.2d 3 (2d Cir.1986).[14] The contrast in size, layout, design and logo type of the marks is relevant to determining similarity. *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir.1985). The same holds true with respect to color combinations and ornamentations. *Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 467 F.Supp. 366, 373 (S.D.N.Y.), *aff'd,* 604 F.2d 200 (2d Cir.1979).

Ortega does not contest that his initial business card, which he designed himself, in which a leftward facing dinghy is substituted for the "D" in both "Dinghy" and "Dock," "substantially copied" plaintiff's registered service mark. (Exh. L; Jt.Stip. ¶ 15). Despite the fact that Ortega's sign utilizes a standard typeset for the "D," Morano clearly had a dinghy in mind, as Ortega had made that suggestion to him. (Exhs. 9–10). Ortega's signs, advertisements, and business cards resemble those of Larsen in the following respects: (1) they have the same color scheme, blue and white, which Morano testified is common for marine products; (2) they contain blue wavelets, which similarly is common for marine products; (3) they advertise, in capital letters, a series of similar products sold by both stores; and (4) the stylized "D" in both "Dinghy" and "Dock" is suggestive of a dinghy, as in Larsen's signs. (*Compare* Exhs. A, D–1 to D–3 *with* Exhs. E–F, W–X, II–JJ). While differences clearly can be discerned from a side-by-side comparison, it is undisputable that the respective marks do "convey the 'same general overall impression' to the purchasing public when viewed separately." *Western Publishing, supra,* 910 F.2d at 61. Thus, the second *Polaroid* factor slightly favors Larsen.

### c. PROXIMITY OF SERVICES

There is no dispute that the services and products provided by both parties are virtually identical. Thus, this third *Polaroid* factor also mitigates strongly in Larsen's favor.

### d. BRIDGING THE GAP

This factor is not applicable here.

### e. EXISTENCE OF ACTUAL CONFUSION

"[E]vidence of *actual* confusion between trademarks is not necessary to a finding of *likelihood* of confusion, although it is the best such evidence." *E. Remy Martin & Co. v. Shaw–Ross International Imports,* 756 F.2d 1525, 1529 (11th Cir.) (emphasis in original) (citation omitted), *reh. denied en banc,* 765 F.2d 154 (11th Cir.1985). The record here is replete with instances of actual confusion, by at least one customer who testified at trial (Krochta) [15], by at least three vendors (Pastimo USA, Inc., Great Canadian, and Achilles), and by a member of the news media (*Milford Citizen* ). The Larsens additionally testified to at least twenty separate incidents of customer confusion in a four-month period, at various boat shows, during telephone inquiries, or at the store itself. Thus, the fifth *Polaroid* factor weighs very heavily in favor of Larsen.

### f. DEFENDANT'S GOOD FAITH IN ADOPTING HIS MARK

A plaintiff in a trademark infringement action need not prove intent to infringe; however, intent to exploit the goodwill created by an already existing mark has been held to create a presumption of likelihood of confusion. *Polo Fashions, Inc. v. Gordon Group,* 627 F.Supp. 878, 886 n. 8 (M.D.N.C.1985) (*citing AMP, Inc. v. Foy,* 540 F.2d 1181, 1186 (4th Cir.1976)). "[T]he defendant must carry the burden of explanation and persuasion" on the issue of his good faith in using the trademark of another. *Kiki Undies Corp. v. Promenade Hoisery Mills, Inc.,* 411 F.2d 1097, 1101 (2d Cir.1969), *cert. denied,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970). Subjective intent of one's good faith is not determinative in an action for trademark infringement, but is an important factor to be weighed along with all

---

**14.** As previously indicated, the trademark specifically provides: "No claim is made to exclusive use of 'Dinghy' apart from the mark as shown." (Exh. A).

**15.** Ortega is correct that his statement to Ruskin about the two stores being affiliated was accurate at the time it was made. *See* text accompanying note 10 *supra.*

other relevant factors. *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 355 F.Supp. 365, 370 (S.D.N.Y.), *aff'd,* 470 F.2d 689 (2d Cir.1972). An intent of bad faith may be inferred. *See Spring Mills, supra,* 689 F.2d at 1134–36.

Ortega has stipulated that he was aware of the existence and high reputation of the Dinghy Place when he started his business and that his first business card "substantially copied" plaintiff's registered service mark. (Jt.Stip. ¶¶ 14–15). When Ortega met with Morano to design the sign for the Milford store, Ortega specifically suggested that the "D" in both "Dinghy" and "Dock" resemble a dinghy. Thus, *Polaroid*'s sixth factor also militates in favor of Larsen.

### g. QUALITY OF DEFENDANT'S SERVICES

One of the reasons for protecting a trademark owner's mark is to prevent damage to the reputation of the mark. *Lever Brothers Co. v. American Bakeries Co.,* 693 F.2d 251, 258 (2d Cir.1982). As there was no evidence as to the quality of Ortega's services as compared to that of Larsen, this factor similarly is not applicable here.

### h. SOPHISTICATION OF BUYERS

Members of the general public who purchase inexpensive items in supermarkets and grocery stores have been held to exercise "a lesser standard of purchasing care," so that "the possibility of confusion is even more likely than where the purchase results from care and deliberation." *Nabisco Brands, Inc. v. Kaye,* 760 F.Supp. 25, 29 (D.Conn. 1991) (citation omitted). In contrast, "[s]ophistication of consumers usually militates against a finding of a likelihood of confusion...." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1228 (2d Cir.1987) (citation omitted); *Wonder Labs, Inc. v. Procter & Gamble Co.,* 728 F.Supp. 1058, 1066 (S.D.N.Y.1990) (*citing Centaur Communications, supra*). However, "where the products are identical and the marks are identical, the sophistication of buyers cannot be relied on to prevent confusion." *McGregor–Doniger, supra,* 599 F.2d at 1137. *See also Banff, Ltd. v. Federated Depart-*

*ment Stores, Inc.,* 841 F.2d 486, 492 (2d Cir.1988) (where both parties produce lines of quality apparel under strongly similar marks for "relatively sophisticated" purchasers, this factor does not mitigate the likelihood of confusion).

As Larsen testified, his customers fall into two distinct categories: (1) first-time buyers and (2) experienced yachtsmen, who consider themselves "absolute experts" and who are "keen shoppers." The latter category far outweighs the former. The price range of boats sold by the Dinghy Place range from a low of $250 for an unpainted wooden frame to a high of $9,000 for certain inflatables. Irrespective of into which category potential customers are placed, they are likely to engage in comparison-shopping for items in such a high price range, particularly if they are experienced boaters who are "keen shoppers." However, given the identical product lines carried by the parties and the similar nature of their service marks, the relative sophistication of buyers by itself does not mitigate against the likelihood of confusion.

### 2. SPECIAL DEFENSES TO COUNTS I & II

Ortega has asserted two interrelated affirmative defenses with respect to plaintiff's first two counts—permitted use and acquiescence/estoppel. As the Fourth Circuit summarized in *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.,* 743 F.2d 1039, 1046 (4th Cir.1984):

> [a]cquiescence constitutes a ground for denial of relief only upon a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant. Acquiescence may be inferred from the trademark owner's affirmative conduct toward the defendant.

(citations omitted). "[W]hether conduct amounts to acquiescence warranting denial of relief turns on an examination of all the surrounding circumstances, and requires a balancing of the equities." *Carl Zeiss Stiftung v. Veb Carl Zeiss Jena,* 433 F.2d 686,

704 (2d Cir.1970) (citation omitted), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). *See also Ambrosia Chocolate Co. v. Ambrosia Cake Bakery, Inc.,* 165 F.2d 693, 694 (4th Cir.1947), *cert. denied,* 333 U.S. 882, 68 S.Ct. 914, 92 L.Ed. 1157 (1948); *Quality Inn Int'l, Inc. v. McDonald's Corp.,* 695 F.Supp. 198, 213 (D.Md.1988).

Sometime after May 10, 1988, Ferguson received a draft of a license agreement, prepared by Ortega's counsel, to use the name "The Dinghy Place." After Ortega found a suitable location in Milford for his store, he had discussions with Ferguson some time prior to June 1, 1988 about the name "The Dinghy Dock"; Ferguson testified that he discouraged Ortega from using such name, but that he did not reject it outright. Between June 1988 and October 1988, Ortega purchased his inventory from Ferguson. Ferguson allowed Ortega to use his name as a sponsor for membership in the CMTA. Although the licensing agreement never was executed, Ferguson and Ortega operated under an "oral understanding" which essentially mirrored the terms set forth in the document.

No controversy apparently was raised until Sunday, January 22, 1989, slightly more than six months later, when Larsen and Ferguson both saw Ortega's business card for the first time. The issue surfaced again the next day, Monday, January 23, 1989, when Ferguson telephoned Ortega, during which conversation Ortega agreed to modify his business card, but refused, for financial reasons, to alter his sign. On or about February 10, 1989, Larsen's attorney forwarded a letter to Ortega, with a follow-up telephone call on April 12, 1989.

Even assuming *arguendo* that Ferguson, as trademark owner, engaged in "affirmative conduct" which gave "assurance to [Ortega], express or implied" that he would not assert his trademark rights against defendant, such tacit approval came to a grinding halt as of January 22, 1989, when Ortega and Larsen had their first confrontation. The facts presented here differ dramatically from those in *Ambrosia Chocolate, supra,* cited by Ortega, where the plaintiff, a chocolate manufacturer, not only was aware for *eight years* of defendant, a cake company, but even had attempted to sell its product to defendant in connection with a devil's food cake to be marketed under the "Ambrosia" name. In "balancing the equities," it would appear that any hardship created by the ambiguous relationship between Ferguson and Ortega ought to fall upon Ortega, who for six months operated under a rather tenuous "oral understanding," in sharp contrast to Larsen, who entered into lengthy negotiations with Ferguson, ultimately resulting in a closing held on November 1, 1988, in which carefully drafted documents were executed. While the Court certainly is sympathetic to Ortega's predicament, he did significantly contribute to his own plight, by allowing Ferguson to procrastinate in executing the license agreement and in operating his business without any formal guidance as to the service mark used.

### 3. CONCLUSION

Accordingly, judgment shall enter for Larsen with respect to Counts I and II.

## B. State Court Claims

### 1. COUNT III

Larsen's third count alleges common law unfair competition. As the Connecticut Supreme Court held some forty-five years ago in applying this cause of action to confusingly similar tradenames:

"No inflexible rule can be laid down as to what use of names will constitute unfair competition; this is a question of fact. The question to be determined is whether or not, as a matter of fact, the name is such as to cause confusion in the public mind as between the plaintiff's business and that of the defendant, resulting in injury to the plaintiff. The test is whether the public is likely to be deceived. If the court finds that the effect of appropriation by one corporation of a distinctive portion of the name of another is to cause confusion and uncertainty in the latter's business, injure them pecuniarily and otherwise, and deceive and mislead the public, relief will be afforded. It is not sufficient that some person may possibly be misled but the similarity must be such that any

person, with such reasonable care and observation as the public generally are capable of using and may be expected to exercise, would be likely to mistake one for the other."

*Yale Co-operative Corp. v. Rogin,* 133 Conn. 563, 571, 53 A.2d 383 (1947) (citation omitted). *See also Shop–Rite Durable Supermarket, Inc. v. Mott's Shop Rite of Norwich, Inc.,* 173 Conn. 261, 377 A.2d 312 (1977); *Homecraft of Milford, Inc. v. Homecraft Construction Co.,* 1991 WL 57796, 1991 Conn.Super. LEXIS 698 (Super.Ct.1991).

There is no reason why this rationale does not apply equally to service marks, as opposed to tradenames. As previously discussed in Section II.A.1. *supra,* the facts have established actual "confusion in the public mind" between the parties' stores here, despite the exercise of "reasonable care and observation." *See also Nabisco Brands, supra,* 760 F.Supp. at 29.

### 2. COUNT IV

██ Larsen's last count alleges a CUTPA violation. "The Connecticut General Assembly deliberately chose not to define the scope of unfair or deceptive acts proscribed by CUTPA so that courts might develop a body of law responsive to the marketplace practices that actually generate such complaints." *Sportsmen's Boating Corp. v. Hensley,* 192 Conn. 747, 755, 474 A.2d 780 (1984). In determining whether a practice is unfair within the meaning of CUTPA, it is necessary to consider:

"(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [ (competitors or other businessmen) ]."

*McLaughlin Ford, Inc. v. Ford Motor Co.,* 192 Conn. 558, 568, 473 A.2d 1185 (1984) (citations omitted). "Predictably, CUTPA has come to embrace a much broader range

of business conduct than does the common law tort action." *Sportsmen's Boating, supra,* 192 Conn. at 756, 474 A.2d 780 (citations omitted).

Attached as Appendix F to Larsen's post-trial brief is an unpublished copy of *Haas Moving & Storage, Inc. v. Hansen,* Dkt. No. 238363 (Super.Ct. June 18, 1987), in which the plaintiff operated a business in East Haven under the name "Guy's Moving and Storage," and defendant ran a similar operation, also in East Haven, with the name "Two Guys Moving and Storage." Evidence was introduced at trial that on several occasions, in answering telephone calls, the defendant had identified herself by the plaintiff's business name. The Superior Court found such actions "constitute unfair and deceptive acts in the conduct of commerce" and thus "constitute a violation of CUTPA." Slip op. at 2–3.

For the reasons previously discussed in Sections II.A.1. & B.1. *supra,* the same result is reached here. *See also Nabisco Brands, supra,* 760 F.Supp. at 29.

### 3. CONCLUSION

Accordingly, judgment may enter for Larsen with respect to Counts III and IV.

### C. Remedies

### 1. DAMAGES AND INJUNCTIVE RELIEF

██ 15 U.S.C. § 1117(a) provides that when a violation under § 1125(a) has been established,

the plaintiff shall be entitled, ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to provide defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual dam-

ages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

Although a plaintiff need not establish its damages "with exacting precision, the Court is not allowed to rely on an assumption of lost sales to establish commercial injury." *Manufacturers Technologies, Inc. v. CAMS, Inc.,* 728 F.Supp. 75, 85 (D.Conn.1989) (citations omitted). Section 1117(a) allocates the initial burden of proving gross sales to the plaintiff, while the defendant bears the burden of proving costs. *American Honda Motor Co., Inc. v. Two Wheel Corp.,* 918 F.2d 1060, 1063 (2d Cir.1990). A finding of infringement "does not automatically entitle plaintiff to an accounting. Rather, an accounting is appropriate if defendant 'is unjustly enriched, if the plaintiff sustained damages from the infringement, or if an accounting is necessary to deter a willful infringer from doing so again.'" *Weight Watchers Int'l, Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1288–89 (S.D.N.Y.1990) (citations omitted). Punitive damages, however, may not be awarded. *Getty Petroleum Corp. v. Bartco Petroleum Corp.,* 858 F.2d 103 (2d Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).

Larsen testified that he "absolutely" believes that Dinghy Place has been damaged by the infringement, as most of the sales made by Dinghy Dock would have been made by his store instead. (Tr. 22). He introduced copies of Ortega's Form 1040, Schedule C, for the years 1988, 1989, and 1990 (Exhs. CC–EE), which provided the following financial information:

| ITEM | 1988 | 1989 | 1990 | TOTAL |
|---|---|---|---|---|
| Gross Sales | $32,365 | $73,763 | $66,548 | $172,676 |
| Cost of Goods | 29,999 | 73,431 | 49,568 | 152,998 |
| Gross Profit | 2,366 | 332 | 16,980 | 19,678 |
| Gross Income | 6,601 | 19,352 | 26,480 | 52,433 |
| Net Profit/Loss | (19,405) | (16,072) | (3,897) | (39,374) |

(*See also* Tr. 8, 20, 35–36, 44, 48–52). Based upon the information in his tax returns, Ortega's average gross profit-to-sales ratio for these three years was 11.4%. Larsen further introduced documents prepared by Ortega, which listed all of Ortega's sales from June 1, 1990 through the time of trial. (Tr. 19–20; Exhs. GG & GG–1). The parties stipulated that Ortega's gross sales for such time period was $49,848, a figure remarkably close to Larsen's estimation of $51,869. (Tr. 36–37, 45–47).[16] Applying the three-year average to Ortega's stipulated post-June 1, 1990 sales produces a gross profit of $5,683. A pro rata deduction from the 1988 gross profit figure is necessary, as Larsen did not purchase the Dinghy Place until November 1, 1988, resulting in a deduction of $986 for the period June 1, 1988 through October 31, 1988. Thus, Dinghy Dock's gross profit from November 1, 1988 through September 30, 1991 is approximately $24,375. *See American Honda, supra,* 918 F.2d at 1062, 1064.

However, in accordance with § 1117(a), the Court finds that the amount of recovery based on profits is excessive, in that Ortega would have made *some* sales, even had he utilized a non-infringing service mark. Accordingly, judgment shall enter in favor of Larsen in the amount of $15,000, a sum determined by the court, in its discretion, "to be just, according to the circumstances of the case."

A permanent injunction, in accordance with 15 U.S.C. § 1116, is proper "only when there is a likelihood not only that consumers

**16.** Ortega presented no evidence on the issue of    damages.

could have been misled in the past, but that consumers will be misled in the future." *Weight Watchers, supra,* 744 F.Supp. at 1288 (citation omitted). Such is the case here. Accordingly, a permanent injunction shall issue, enjoining Ortega from further use of his present service mark.

### 2. ATTORNEYS' FEES AND COSTS

The last sentence of § 1117(a) provides that "The court in exceptional cases may award reasonable attorney fees to the prevailing party." "Exceptional cases are those where acts of infringement can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or willful.'"" *Weight Watchers, supra,* 744 F.Supp. at 1289 (citations omitted). *See also Berkshire Fashions, Inc. v. Sara Lee Corp.,* 729 F.Supp. 21, 22–23 (S.D.N.Y. 1990); *Manufacturers Technologies, supra,* 728 F.Supp. at 85–86. While Ortega's actions in copying the Dinghy Place's service mark were "deliberate," they do not rise to the level of "exceptional," particularly given the tenuous relationship between Ortega and Ferguson prior to November 1, 1988.

For similar reasons, the Court declines to award Larsen attorney's fees pursuant to Conn.Gen.Stat. § 42–110d, "given the relative lack of significance of the CUTPA claims vis-a-vis the other claims asserted...." *Manufacturers Technologies, supra,* 728 F.Supp. at 86.

### D. Ortega's Counterclaim

Ortega's counterclaim asserts a CUTPA claim against Larsen, arising out the conversation held at the Dinghy Dock on January 23, 1989, in which Larsen allegedly represented that three weeks earlier he had instructed Starwing not to do any business with Ortega.[17] When Ortega spoke with Steven Brainard of Starwing that week to discuss his spring dating orders, Ortega had the "impression" that Starwing was "stalling" him. (Tr. 85–90, 97–98). As Larsen observed, it would have been impossible for him to have made that instruction in early January 1989, as he did not even know of the Dinghy Dock's existence at such time. (Tr.

17. *See* note 12 *supra* and accompanying text.

101). One week later, on January 30, 1989, Jeff Brainard of Starwing pledged to Larsen, in writing, that Starwing would not "ship" to Ortega during the pendency of the litigation. (Exh. 7). As Larsen explained, Starwing ceased production during the spring of 1989, due to a familial dispute within the Brainard family. (Tr. 101–02). Moreover, Ortega conceded that Starwing never rejected any orders he placed. (*Id.* at 97). In addition, there was no evidence that Ortega ever tried to order any Point Jude boats from Starwing's subsidiary, Pilot Boat Co., in which Larsen and his wife had a fifty percent interest. (Tr. 53–54, 66–67, 102–03; *Tr.* 31, 38, 40). Thus, there is absolutely no evidence to support Ortega's counterclaim.

### III. CONCLUSION

Accordingly, judgment shall enter for Larsen on his complaint in the amount of $15,000 plus costs and Ortega shall be permanently enjoined from infringing upon Larsen's registered service mark. Judgment also shall enter for Larsen on Ortega's counterclaim.

### JUDGMENT

This cause came on for trial before the Honorable Joan Glazer Margolis, United States Magistrate Judge, pursuant to 28 U.S.C., Section 636(c) of the Fed.R.C.P., and the issues having been duly tried and the Court having rendered its Memorandum of Decision as its Findings of Act and Conclusions of Law,

It is ORDERED and ADJUDGED that judgement be and is hereby entered in favor of the plaintiff Per F. Larsen on his complaint in the amount of $15,000.00 plus costs, and

It is further ORDERED and ADJUDGED that the defendant Raymond Ortega be permanently enjoined from infringing upon Larsen's registered service mark and judgment shall enter for Larsen on Ortega's counterclaim, in accordance with the Court's Memorandum of Decision.

RULING ON PLAINTIFF'S MOTION TO
ALTER OR AMEND JUDGMENT
UNDER F.R.CIV.P. 59(e)

Familiarity is presumed with this Magistrate Judge's thirty-six page Memorandum of Decision, filed February 10, 1992 (Dkt. # 60) ["Decision"], which, *inter alia,* entered judgment in plaintiff Larsen's favor in the amount of $15,000 and permanently enjoined defendant Ortega from infringing upon Larsen's registered service mark. Judgment was entered on February 14, 1992 (Dkt. # 63) ["Judgment"].

On March 2, 1992, Larsen filed the pending motion to alter or amend judgment under F.R.Civ.P. 59(e)[1] (Dkt. ## 65–67). Ortega has failed to file a timely objection. *See* Local Rule 9(a)1. For the reasons stated below, Larsen's motion is *granted in part and denied in part.*

## I. DISCUSSION

In his motion, plaintiff asks the Court to alter or amend the judgment in four respects: (1) by rewording the injunction entered in the Judgment; (2) by recalculating defendant's profits; (3) by including plaintiff's damages in the monetary award; and (4) by awarding attorney's fees pursuant to 15 U.S.C. § 1117(a) or Conn.Gen.Stat. § 42–110g(d).

Rulings under Rule 59(e) are "committed to the sound discretion of the district judge and will not be overturned on appeal absent an abuse of discretion." *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983). Rule 59(e) "recognizes only three possible grounds for any motion for reconsideration: (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, and (3) the need to correct a clear error of law or prevent manifest injustice." *Atkins v. Marathon LeTourneau Co.,* 130 F.R.D. 625, 626 (S.D.Miss.1990) (citation omitted). Regarding the second ground, the court in *Natural Resources Defense Council*

*v. United States Environmental Protection Agency,* 705 F.Supp. 698 (D.D.C.) ["*NRDC I* "], *vacated on other grounds,* 707 F.Supp. 3 (D.D.C.1989) warned: "Rule 59(e) motions are not vehicles for bringing before the court theories or arguments that were not advanced earlier. Nor may the motion present evidence which was available but not offered at the original ... trial." 705 F.Supp. at 701–02 (multiple citations omitted). Similarly, in *Atkins* the court added: "With regard to the third ground, the Court cautions that any litigant considering bringing a motion to reconsider based upon that ground should evaluate whether what may seem to be a clear error of law is in fact simply a point of disagreement between the Court and the litigant." 130 F.R.D. at 626 (footnote omitted).

Plaintiff's motion is granted with respect to the first request, so that the Judgment shall read as follows:

> It is further ORDERED AND ADJUDGED that the defendant Ray–Edward Ortega be permanently enjoined from further use of his present service mark, from infringing Larsen's registered service mark No. 1,209,259 and from use of any service mark or tradename which is confusingly similar to Larsen's service mark and tradename The Dinghy Place....

As to the second request, Larsen is correct that p. 33 of the Decision contains a typographical error, in that $49,848 represents Ortega's gross sales from *January 1, 1991* until September 30, 1991, and not from *June 1, 1990.* Larsen argues that because Ortega did not present any evidence as to the cost of goods for that period, as he did for the three prior years, Ortega's gross profits for the first three quarters of 1991 should be deemed to be the entire amount of $49,848. Larsen argues that the court abused its discretion in applying Ortega's gross profit-to-sales ratio of 11.4% to the 1991 figures.[2] Just the opposite is true, for it would be an abuse of discretion to presume that Ortega

---

1. The caption of the motion erroneously refers to Rule *50* (e).

2. In ¶ 7 of his affidavit, Larsen described Ortega's tax returns as being so "unbelievable and incredible" that he "seriously doubt[s]" their ac-

curacy. Ortega's remarkably slim profit margin is more likely the product of business ineptitude, as demonstrated in his prior dealings with Ferguson (*see* Decision at 4–9), than a reflection of blatant tax fraud.

had no costs associated with the goods he sold in January through September 1991.

Larsen's third request is that the court award him damages under either 15 U.S.C. § 1117(a) or Conn.Gen.Stat. § 42–110g. Through elaborate calculations, after consultation with dealer manuals from three manufacturers, Larsen calculates such damages to be $28,971. (Larsen Aff't ¶¶ 9–10). Had Larsen presented such evidence at trial, the Court, in all likelihood, would have awarded him such damages. However, as *NRDC I* makes clear, it is not the purpose of Rule 59(e) to "present evidence which was available but not offered at the original ... trial." 705 F.Supp. at 702 (multiple citations omitted).

Last, Larsen requests $65,390.29 in attorney's fees, indicating that he was "appalled" by the court's failure to order the payment of such fees and that he has "not received justice".as a result. (Larsen Aff't ¶¶ 28c. & g.) As indicated in the Memorandum, at 34–35, while Ortega's actions were "deliberate," they did not rise to the level of "exceptional," given the tenuous relationship between Ortega and Ferguson prior to November 1, 1988.

## II. CONCLUSION

Accordingly, plaintiff's motion to alter or amend judgment (Dkt. # 65) is *granted* with respect to the language of the injunctive relief in the Judgment, but is *denied* in all other respects.